JOHN DARRILL CONNELLY, Plaintiff-Appellee, *v.* UNIROYAL, INC., *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 76-257

Opinion filed December 7, 1977.

Chadwell, Kayser, Ruggles, McGee & Hastings, of Chicago (David J. Gibbons, of counsel), for appellants.

John E. Norton & Associates, of Belleville and James R. Sullivan and Peter A. Fasseas, both of Chicago (Edward J. Kionka, of counsel), for appellee.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:
This is an interlocutory appeal with the permission of this court

pursuant to Illinois Supreme Court Rule 308 (Ill. Rev. Stat. 1975, ch. 110A, par. 308) in which each defendant has raised an independent question.

We consider first the issue raised by defendant Uniroyal Englebert Belgique, S.A. (Englebert), a Belgian corporation, neither registered nor found in Illinois. Englebert was served in Belgium with summons issued by the circuit court of Cook County, and moved to quash that service, claiming it had done nothing to submit itself to the jurisdiction of our courts. The circuit court denied the motion to quash, and Englebert's appeal requires us to grapple with the concept of the "commission of a tortious act within" Illinois, which brings a non-resident into our courts under the authority of the State long-arm statute. (Ill. Rev. Stat. 1973, ch. 110, par. 17(1)(b).) In view of the conclusion we reach, it is unnecessary to consider whether Englebert is subject to the jurisdiction of Illinois courts because it is doing business in Illinois (see *St. Louis-San Francisco Ry. Co. v. Gitchoff* (1977), 68 Ill. 2d 38, 369 N.E.2d 52) or because there was any transaction of business in Illinois by Englebert. See Ill. Rev. Stat. 1973, ch. 110, par. 17(1)(a).

Englebert manufactures and sells tires, including tires sold to General Motors in Belgium. The latter corporation manufactures or assembles its Opel automobiles in a General Motors plant in Belgium, and ships them to the United States.

Plaintiff's father purchased an Opel with Englebert tires from an Illinois Buick dealer on September 13, 1969. The automobile was garaged, maintained and principally used in Illinois. Plaintiff was injured when a tire on the Opel failed while the auto was being operated in Colorado.

Plaintiff as well as his father are residents of Illinois. Plaintiff has verified an affidavit stating that the majority of the witnesses who will be called in the action, except for those employed by defendants, are located in Illinois or could more conveniently be brought here than to Colorado or elsewhere. This is not contested by Englebert. Englebert contends Illinois has no jurisdiction because the cause of action did not arise from a commission of a tortious act by Englebert in Illinois.

Englebert's appeal raises two separate inquiries: First, can the language, "the commission of a tortious act within this State," as used in the long-arm statute be construed to include the acts of Englebert; and second, does the record show Englebert had sufficient minimum contacts with Illinois to subject it to jurisdiction in Illinois without violating due process standards.

We direct attention first to the interpretation of the language employed in the Illinois long-arm statute. *Gray v. American Radiator & Standard Sanitary Corp.* (1961), 22 Ill. 2d 432, 176 N.E.2d 761, a leading and often cited case in the application of a State long-arm statute relating to a tortious act, construed the Illinois statute to include injuries suffered in this

State by Illinois residents as a result of defective products manufactured outside this State. *Gray* relied on the theory that, for purposes of jurisdiction, the place of injury is the place of a tortious act. Nothing in *Gray*, however, precludes Illinois courts from using the State long-arm statute to acquire jurisdiction based on the commission of a tortious act where the injury in a product-liability case was not suffered in Illinois. The *Gray* opinion does not foreclose this court from concluding that a "tortious act" was committed in Illinois within the meaning of section 17(1)(b) of the long-arm statute, even though the injury occurred outside Illinois.

*Gray* did not hold that a "tortious act," as those words are used in the statute, cannot occur before the injury is suffered and a cause of action exists. In fact, *Gray* recommended a flexible application of the long-arm statute. In referring to the legislative intent in employing the term "tortious act," the court there said:

> "We think the intent should be determined less from technicalities of definition than from considerations of general purpose and effect. To adopt the criteria urged by defendant would tend to promote litigation over extraneous issues concerning the elements of a tort and the territorial incidence of each, whereas the test should be concerned more with those substantial elements of convenience and justice presumably contemplated by the legislature. As we observed in *Nelson v. Miller*, 11 Ill.2d 378, the statute contemplates the exertion of jurisdiction over nonresident defendants to the extent permitted by the due-process clause." *Gray*, at 436.

And, in the earlier case of *Nelson v. Miller* (1957), 11 Ill. 2d 378, 143 N.E.2d 673, the court considered the word "tortious" as used in the long-arm statute:

> "The word 'tortious' can, of course, be used to describe conduct that subjects the actor to tort liability. For its own purposes the Restatement so uses it. (Restatement, Torts, §6.) It does not follow, however, that the word must have that meaning in a statute that is concerned with jurisdictional limits. To so hold would be to make the jurisdiction of the court depend upon the outcome of a trial on the merits. There is no indication that the General Assembly intended a result so unusual. The essential question in cases of this type is where the action is to be tried. Once it has been determined that the relationship of the defendant to the State is sufficient to warrant trial here, we are of the opinion that the court has jurisdiction to determine the merits of the controversy, and that its jurisdiction will not be destroyed by its exercise." (*Nelson*, at 392.)

We interpret *Nelson* to mean that the words of the statute are subject to a variety of interpretations—a not unusual feature of the judicial process. (See *In re Application of County Collector* (1976), 44 Ill. App. 3d 327, 331-332, 357 N.E.2d 1302.) The court also observed in *Nelson*:

> "The substantial objective of the new jurisdictional provisions is to enable the plaintiff to obtain a trial of the issues of liability and of damages in this State, when the circumstances make it the appropriate and convenient forum for that purpose." *Nelson*, at 393.

This analysis favoring a flexible approach is supported by *Braband v. Beech Aircraft Corp.* (1977), 51 Ill. App. 3d 296, 367 N.E.2d 118, which is similar to the case before us inasmuch as the place of injury there was also outside Illinois. *Braband* involved a 5-year-old plane which Beech designed and manufactured; the plane was previously sold to firms located in Texas and Nevada, and later sold to a business in Illinois, where the plane was based. The aircraft took off from Illinois for a trip to England for delivery to its purchaser, but crashed while approaching an airport in the northwest territories of Canada. The plaintiffs, executors of the estates of the deceased pilots, sued Beech in Illinois, charging both that vital parts of the plane were not reasonably safe as manufactured by Beech, and that the plane was not aerodynamically sound. The plane had not been manufactured in Illinois and Beech had no connection with the sale of the plane to anyone in Illinois or its presence in Illinois before being flown to England. Beech responded that it had neither committed a tortious act in Illinois nor transacted business here.

The two majority opinions in the case upheld jurisdiction in Illinois based on different theories. One of the opinions concluded that Beech committed a tortious act within Illinois. The second majority opinion concluded jurisdiction was proper under section 13.3 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 13.3) because Beech was doing business in Illinois. The observations of the majority opinion which relied on the "tortious act" provison of the long-arm statute are particularly relevant here:

> "Considering the expansive definition of the word 'tortious' as stated in the case law, I believe that a tortious act was committed by the delivery into Illinois of a plane that was allegedly unreasonably dangerous. A tort to be an actionable wrong, requires a duty, a breach of the duty and an injury. (*Mieher v. Brown* (1973), 54 Ill. 2d 539, 541, 301 N.E.2d 307.) The chain culminating in the death of the plaintiffs' decedents began in Kansas with the breach of the duty when the allegedly defective plane was manufactured. That condition persisted until it became

a cause of action with the crash in Canada causing the deaths. Between the manufacture and the crash the allegedly defective plane was purchased by an Illinois corporation and was based in Illinois for a period of time. A duty was owed to the residents of Illinois. The injury in the instant case is to the plaintiffs who reside in Illinois. Whether injury or death Illinois has the right to provide redress against those who inflict injuries upon 'those within the ambit of the State's legitimate protective policy.' * * * The word 'tortious' considering the history of the word in its context in the Civil Practice Act should include the delivery of the allegedly defective plane." *Braband*, at 301.

■■ Based on these authorities, we conclude that the phrase "commission of a tortious act" as employed in the long-arm statute applies not only to an injury which occurs in Illinois, but also to all elements and conduct which significantly relate to or have significant causal connection with the injury suffered.

■■ One of the elements which plaintiff claims led to his injury is that the Opel car was imported into Illinois with the allegedly defective tire and then sold to plaintiff's father. In a product-liability action, liability is imposed on a manufacturer who places a defective product in the stream of commerce. An element of this cause of action is the distribution of a defective and unreasonably dangerous product. Thus, it is at least as realistic to treat the distribution of such a product in Illinois as a tortious act for the purpose of jurisdiction as to focus on only the consequences of the sale and the place where the product causes injury. Because Illinois had a significant connection with the movement of the tire from Belgium to the place of injury, and particularly because the allegedly defective tire was shipped to Illinois, the Opel with the defective tire was purchased here by an Illinois resident, and the car and tire were used and maintained in Illinois for a substantial period of time, we conclude that elements of a tortious act sufficient to satisfy the meaning of the long-arm statute took place in Illinois.

In reaching this result we have considered *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305, on which Englebert relies. In that case, in applying a statute of limitations for injury to the person in a product-liability action, the supreme court was concerned with determining when the cause of action accured. The conclusion we reach in this case, that for the purpose of the State long-arm statute a "tortious act" may be committed before a cause of action accrues and the statute of limitations commences to run, is not inconsistent with *Williams*. Nothing in *Williams* indicates that the interpretation of the long-arm statute is governed by the application of

the limitations statute, or requires that the words "tortious act" as used in the long-arm statute be construed to require an injury to occur in Illinois before the courts of this State may acquire jurisdiction.

■■ Three additional considerations buttress the conclusion we reach in construing the statute. First, the long-arm statute of Illinois has been characterized as one which provides jurisdiction over nonresidents to the fullest extent permitted by due process concepts. (*Nelson*, at 389.) Because, as pointed out below, Englebert had sufficient contacts with Illinois to satisfy due process requirements, there is no reason to construe the words "tortious act" as used in the long-arm statute so strictly that assertions of jurisdiction which do not offend due process are limited, rather than expanded to the fullest possible extent the statute will permit.

Second, public policy dictates this result. In our economy, products are advertised for nationwide distribution and sale over the entire country through television, radio and nationally circulated newspapers and periodicals, and distributed throughout our nation. (*Bolf v. Wise* (1970), 119 Ill. App. 2d 203, 208, 255 N.E.2d 511.) With automobile and airplane travel commonplace in our society, people move across State lines in vast numbers each year. In such an economic setting, it is at least as logical to construe a long-arm statute to provide jurisdiction in the place where the defective product was purchased and the injured party resides as in the place where, through chance, the product happened to be when it failed. The need for a common-sense solution to the problem of providing a forum in product-liability cases, instead of an ostrich-like reliance on technical concepts of the accrual of an actionable wrong, is strikingly demonstrated by Professor David P. Currie's widely-quoted article, *The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois*, 1963 U. Ill. L.F. 533.

Finally, the application of the long-arm statute is especially suitable where, as here, Englebert makes no attempt to demonstrate that it would be more inconvenienced by appearing in Illinois than in Colorado. As pointed out in *Gray*, modern "facilities for transportation and communication have removed much of the difficulty and inconvenience formerly encountered in defending lawsuits brought in other states." (*Gray*, at 442-43.) Not only will Englebert not be physically inconvenienced by responding in Illinois, but it appears that its legal position will not be prejudiced either, for Englebert has conceded in this court that the body of product-liability law in Colorado is substantially comparable to the law of Illinois. In addition, Colorado, like Illinois, appears to adhere to the concept that the law of the forum having the most significant relationship with the occurrence and with the parties should be applied in preference to the law of the State where the injury occurred. (*Ingersoll v. Klein* (1970), 46 Ill. 2d 42, 262 N.E.2d 593; *First*

*National Bank v. Rostek* (1973), 182 Colo. 437, 514 P.2d 314.) Thus, even if the plaintiff is banished from Illinois, since the Opel was purchased, maintained and driven here during most of its use, it is likely that Colorado courts would conclude that Illinois had the most significant relationship with the parties and would apply Illinois law in deciding this case.

For all these reasons, we conclude that Englebert committed a tortious act in this State within the meaning of section 17(1)(b) of the Civil Practice Act.

■■ In addition to determining that the language of the long-arm statute was satisfied by the events which took place in Illinois, Englebert's appeal also requires us to decide whether it had sufficient minimum contacts with Illinois to satisfy the due process standards applicable to long-arm jurisdiction. Essentially, this depends upon whether it is fair to require Englebert to defend an action here. *International Shoe Co. v. Washington* (1945), 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154; *St. Louis-San Francisco Ry. Co. v. Gitchoff*; see also *Hanson v. Denckla* (1958), 357 U.S. 235, 2 L. Ed. 2d 1283, 78 S. Ct. 1228.

■■ The shipment of a single defective tire into Illinois may be enough to satisfy the minimum contact requirement of due process, but it is not necessary to deal with that question in this case. In opposing Englebert's motion to quash the service of summons, plaintiff offered evidence that in a 4-year period an average of more than 800 Opels with Englebert tires were brought into Illinois annually, and that the estimated number of Englebert tires on Opels in Illinois each year was at least 4,000. Where defendant's product reaches Illinois in such quantity, it is neither unjust nor unreasonable to require the producer to come to Illinois to defend an action based upon a defect in the product. Englebert knew that its tires would be installed in Opels destined for export to the United States and that some of the Opels equipped with its tires would be sold in Illinois. It was reasonably foreseeable to Englebert that people would be injured if defective tires were attached to Opels sold in Illinois, and it is not inconsistent with due process to subject Englebert to the exercise of jurisdiction by the State where an injured user resides. As long as Englebert's tires were coming into Illinois in substantial numbers as part of a regular and continuing process of distribution, there was enough contact with Illinois to satisfy due process requirements.

Clearly, Englebert here had as much contact with Illinois as did the manufacturer in *Gray*, where the court inferred that defendant's commercial transactions, like those of other manufacturers, resulted in substantial use and consumption in Illinois. In *Gray*, the court concluded that requiring a manufacturer to answer to a suit in a State where it elects to distribute its products for ultimate use does not offend traditional

notions of justice. (*Gray,* at 442.) And Englebert had greater and more continuous contact with Illinois than Beech was shown to have had in *Braband.*

We therefore affirm the circuit court's order denying the motion to quash service of summons on Englebert.

Uniroyal, Inc. (Uniroyal), is the second defendant. Count I of the amended complaint, based on strict product-liability, alleges that Uniroyal designed and manufactured the tire in question and placed it in the stream of commerce. It further alleges that the claimed defect was present when the tire "left the possession and control of" Uniroyal.

Count II alleges that Uniroyal "was negligent in the design, manufacture and sale" of the tire by failing to inspect the tire properly before it left Uniroyal's possession, by failing to perform adequate tests on the tire and its components, and by failing to maintain proper humidity and other environmental conditions within the manufacturing plant. Uniroyal moved for summary judgment on both counts, and appeals from the denial of its motion. Uniroyal contends it is not liable on either count because it did not design, manufacture or sell the tire. The order entered by the circuit court on Uniroyal's motion for a finding to justify the permissive interlocutory appeal pursuant to Illinois Supreme Court Rule 308(a) identifies the question of law raised by Uniroyal's motion for summary judgment as follows:

> "* * * whether a corporate parent who licenses its trademark to its corporate subsidiary is responsible in tort to the user of a product on which the trademark name appears * * * where the owner of the trademark was not the manufacturer of the product, did not sell or distribute that product, but was engaged in the business of manufacturing and selling similar products."

At the time plaintiff's father purchased the Opel, Uniroyal owned 95 percent of Englebert's stock. This enabled Uniroyal to select the seven-man Englebert board of directors. Two of Englebert's directors were directors, officers or employees of Uniroyal. Uniroyal advertises and markets its product nationally in the United States.

The tire which plaintiff claims was defective bore the trademark "UNIROYAL" in block letters. While the tire was labelled "Made in Belgium," it neither bore Englebert's name nor any other markings to indicate it was manufactured by anyone other than Uniroyal. However, at the time the Opel was purchased, neither plaintiff nor his parents were aware of the make or name of the tires on the car. Accordingly, nothing in the record establishes or suggests that the trademark "UNIROYAL" on the tires induced the plaintiff or his family to purchase or use the automobile.

"UNIROYAL" is a registered trademark of Uniroyal. Uniroyal granted

Englebert a nonexclusive license to use the trademark. The license agreement provided Uniroyal was to have knowledge of the goods and manufacturing operations of Englebert associated with its use of the "UNIROYAL" trademark and logo. The agreement also provided that the license of the trademark would terminate at such time as Uniroyal should cease to have the power to exercise management control over that aspect of Englebert's business which made use of the trademark and logo.

The sign outside the Englebert plant in Belgium bears only the name Uniroyal and the Uniroyal logo. Uniroyal and Englebert were parties to a technical service agreement under which Uniroyal undertook to furnish Englebert with consulting and technical information in the areas of engineering and development, including manufacturing methods, processes and formulae. However, there was no evidence that Uniroyal actually controlled or contributed to Englebert's methods, processes or formulae in any way, or that it furnished Englebert with any know-how or procedures relating to the manufacture of tires. Uniroyal has offered uncontroverted evidence that Englebert has operated separately from it, maintaining separate physical facilities and its own books and accounts, and that Englebert has its own banking sources and lines of credit.

Before Uniroyal owned any of the Englebert stock, Englebert was selling its tires to Buick for use on the Opel car. Opel and Englebert jointly developed the type of tire involved in this case to satisfy performance specifications set by Opel. The design work took place at an Englebert factory in Germany and the tire was manufactured at Englebert's plant in Belgium. No Uniroyal employees were employed at either of these Englebert facilities.

Opel's purchase orders for tires went from Opel to Englebert. All the discussions relating to the purchase of tires for use on Opels occurred in Europe and involved only employees of Opel and Englebert. The decision to use the "UNIROYAL" trademark on the tires manufactured by Englebert originated with Englebert. Uniroyal, therefore, takes the position that despite its 95 percent ownership of Englebert, the two corporations have operated separately and Uniroyal is not responsible for the defect in the tire.

Notwithstanding the "UNIROYAL" trademark on the defective tire and Uniroyal's substantial ownership of the stock of Englebert, there is no evidence that Uniroyal was the designer, manufacturer or seller of the tire. Englebert was not a dummy or sham corporation; nor was it operated as a mere instrumentality of Uniroyal. Plaintiff stated to the circuit court that Englebert had "a great deal of autonomy in its day-to-day operations" and states here that Englebert was not a "mere instrumentality." There is no evidence that Englebert was used by Uniroyal as a subterfuge to defeat public convenience, justify wrong or

perpetrate a fraud. Englebert was in the business of manufacturing tires long before Uniroyal's acquisition of its stock. Uniroyal and Englebert always operated as separate entities with separate physical facilities and different employees, and the separate corporate existence of Englebert was not disregarded by Uniroyal. Under Illinois law Uniroyal is not vicariously liable for the alleged tortious conduct of Englebert. *Dregne v. Five Cent Cab Co.* (1943), 381 Ill. 594, 46 N.E.2d 386; *Superior Coal Co. v. Department of Finance* (1941), 377 Ill. 282, 36 N.E.2d 354; *Davis v. John R. Thompson Co.* (1926), 239 Ill. App. 469; *Califf v. Coca-Cola Co.* (N.D. Ill. 1971), 326 F. Supp. 540.

The complaint does not allege that Uniroyal negligently supervised the use of its name, resulting in the injury to plaintiff. Also, since Uniroyal took no part in and did not contribute to the design, manufacture or sale of the tire in question, there is no basis for the allegation that Uniroyal is liable for negligence in its design, manufacture or sale.

■■ Plaintiff also fails on his strict product-liability theory because Uniroyal was neither the manufacturer of the tire nor a participant in any distribution or sale which placed the tire in the stream of commerce. The plaintiff relies on several cases in which the owner of a trademark affixed to a product was held accountable in strict tort liability. It is unnecessary to discuss these cases at length, except to point out that in all of them, with the exception of *Kasel v. Remington Arms Co.* (1972), 24 Cal. App. 3d 711, 101 Cal. Rptr. 314, the trademark owner itself either manufactured the product, supplied the process used in manufacturing the product, or sold the product to which a trademark has been affixed.

The only case plaintiff cites which does not involve the seller of a product is *Kasel,* which presented a product-liability claim relating to ammunition manufactured by a Mexican subsidiary of the defendant, Remington Arms. *Kasel* is distinguishable from the case before us for several reasons. In that case, Remington used its subsidiary as a mere instrumentality. Remington not only created the subsidiary but also managed it by a Remington employee who reported directly to the vice president of Remington. Remington executives who ran the subsidiary were initially assisted by 18 Remington employees sent to Mexico. The equipment installed in the Mexican plant was procured, delivered and designed by Remington. The shell in which the Mexican gunpowder was contained was manufactured by Remington. Remington substantially financed the facilities in Mexico by purchasing stocks and bonds from the subsidiary.

Based on Remington's total involvement in the subsidiary's operations, the court concluded that Remington organized the subsidiary "for its own [Remington's] aggrandizement." (*Kasel,* at 727.) Finally, to promote

purchases of the subsidiary's product by American hunters in Mexico, Remington had advertised the product in California.

In contrast, Englebert was an established company when Uniroyal bought into it. Englebert always has been managed by the Englebert family. Uniroyal has no employees working for Englebert in Belgium. Englebert acquired its own equipment and established the applicable specifications. Englebert provided its own financing, and Uniroyal purchased stock from the Englebert family, not from the subsidiary itself. Unlike Remington, Uniroyal neither involved itself in its subsidiary's corporate life nor participated in the manufacture of its subsidiary's product. Last, Uniroyal's name had nothing to do with the decision of plaintiff or of his family to purchase and use their Opel automobile.

Plaintiff also contends that the provisions of section 400 of the Restatement (Second) of Torts places the same strict product-liability on Uniroyal as if Uniroyal were the manufacturer. As we interpret this section of the Restatement, it was not intended to specifically relate to strict tort liability cases and provides for liability identical to that of a manufacturer only for those who supply a chattel to others by sale, lease, gift or loan. And so long as the record here does not show that Uniroyal played any role in supplying the tire to others, Uniroyal cannot be regarded as "one who puts out a chattel" within the meaning of section 400 as explained by section 400, comment (a). Further, section 400, comment (d) of the Restatement, which covers the precise situation where a party affixes his name or trademark to the product, only states that such a party is responsible on the same basis as the actual manufacturer if he also participates in placing the chattel in the stream of commerce. Moreover, nothing in section 402A, which specifically deals with the doctrine of strict product-liability, suggests that such liability is imposed upon anyone other than a manufacturer, wholesaler, retailer or distributor of a chattel.

If plaintiff's theory is that by permitting its name to be placed on the tire Uniroyal is estopped from denying it was the manufacturer, plaintiff cannot prevail. Under Illinois law such an estoppel is available only to a plaintiff who has relied on the acts or conduct of a defendant which give rise to the estoppel. (*Levin v. Civil Service Com.* (1972), 52 Ill. 2d 516, 288 N.E.2d 97; *Dill v. Widman* (1952), 413 Ill. 448, 456, 109 N.E.2d 765; *Baldwin v. Baldwin* (1974), 21 Ill. App. 3d 380, 315 N.E.2d 649.) Similarly, if plaintiff's theory is that by permitting its name to be placed on the tire Uniroyal misrepresented the source of the tire, plaintiff would not have stated a cause of action without alleging that he or his father, the purchaser of the automobile, relied on the acts or statements of the defendant. (*Yates v. Cummings* (1972), 4 Ill. App. 3d 899, 282 N.E.2d 261;

*Theo. Hamm Brewing Co. v. First Trust & Savings Bank* (1968), 103 Ill. App. 2d 190, 242 N.E.2d 911; Prosser, Torts §108, at 714 (4th ed. 1971).) If plaintiff's theory is that Uniroyal vouched for the tire by permitting its name to be placed on it, thereby associating its good will and responsibility with the tire, Uniroyal's involvement with the tire would be meaningless so far as liability is concerned to a purchaser or user, such as plaintiff, who was not even aware of Uniroyal's connection with the tire.

Plaintiff has not challenged the statement asserted many times by Uniroyal, that the record establishes the absence of any reliance by plaintiff on the Uniroyal name, either when the automobile was purchased or during the car's use. Absent evidence of such reliance, plaintiff cannot be assisted by any theory of estoppel or misrepresentation or by any claim that Uniroyal vouched for the tire.[1] In no sense was Uniroyal or Uniroyal's name on the tires of the automobile a cause of the injury suffered by the plaintiff.

For these reasons, the circuit court's denial of summary judgment in favor of Uniroyal on the question of law identified by the circuit court must be reversed.

Affirmed in part, reversed in part and remanded for further proceedings.

McNAMARA and JIGANTI, JJ., concur.

---

[1] For a recent discussion urging imposition of liability on the trademark owner on a warranty theory see Goldstein, *Products Liability and the Trademark Owner: When a Trademark is a Warranty*, 32 Bus. Lawyer 957 (1977).