(No. 50358.—

JOHN DARRILL CONNELLY, Appellee, v. UNIROYAL, INC., *et al.*—(Uniroyal Englebert Belgique, S.A., Appellant.)

*Opinion filed January 26, 1979.—Modified on denial of rehearing March 30, 1979.*

David J. Gibbons and Stephen A. Gorman, of Chicago (Chadwell, Kayser, Ruggles, McGee & Hastings, Ltd., of counsel), for appellant.

Norton, Bonifield & Associates, of Belleville, and Peter A. Fasseas, of Chicago (Edward J. Kionka, of Columbia, of counsel), for appellee.

MR. CHIEF JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, John Darrill Connelly, brought this action in the circuit court of Cook County against defendants, Uniroyal Englebert Belgique, S.A. (hereafter Englebert), and Uniroyal, Inc. (hereafter Uniroyal), and other defendants not involved in this appeal, seeking to recover damages for personal injuries. The circuit court denied both Englebert's motion to quash the service of summons and Uniroyal's motion for summary judgment and in its orders included the findings requisite to an application for leave to appeal. (S. Ct. Rule 308 (58 Ill. 2d R. 308).) The appellate court allowed defendants' application for leave to appeal, affirmed as to Englebert, and reversed as to Uniroyal (55 Ill. App. 3d 530), and we have allowed defendant Englebert's petition for leave to appeal.

It is alleged in plaintiff's complaint, as amended, that in November 1970 he suffered personal injuries when a tire manufactured by Englebert and bearing Uniroyal's trademark failed while his 1969 Opel Kadett was being operated on a highway in Colorado. Plaintiff's father had purchased the automobile in September 1969 from a Buick dealer in Evanston. The tire bore the name "Uniroyal" and the legend "made in Belgium" and admittedly was manufactured by defendant Englebert, sold in Belgium to General Motors, and subsequently installed on the Opel when it was assembled at a General Motors plant in Belgium. The automobile was shipped to the United States for distribution by General Motors. It appears from answers to interrogatories that between the years 1968 and 1971 in excess of 4,000 Opels imported into the United States from Antwerp were delivered to dealers in Illinois each year; that in each of those years between 600 and 1,320 of the Opels delivered to Illinois dealers were equipped with tires manufactured by Englebert, and that the estimated number of Englebert tires mounted on Opels delivered in Illinois within each of those years ranged from 3,235 to 6,630.

Defendant Englebert alleged in its motion to quash the service of process that its principal place of business is in Belgium; that it is not registered to do business and has never had an agent, employee, representative or salesman in Illinois; that it has never possessed or controlled any real property or maintained any office or telephone listing in Illinois; that it has never sold or shipped any products into Illinois, either directly or indirectly; and that it has never advertised in Illinois. Defendant avers that the summons is "a nullity and [has] no legal effect in that Englebert Belgique has not done any of the acts enumerated in the Illinois Long Arm statute (ch. 110, sec. 17. Illinois Revised Stat.), nor has it otherwise submitted itself to the jurisdiction of the courts of this state"; and that "there is a total lack of contact between Englebert Belgique and the State of Illinois so that an assertion of jurisdiction by this court over this defendant would be contrary to substantial justice and would violate the rights of this defendant under the Constitutions of the United States of America and of the State of Illinois."

The relevant statutes in pertinent part provide:

"Sec. 13.3. Service on private corporations.

A private corporation may be served (1) by leaving a copy of the process with its registered agent or any officer or agent of said corporation found anywhere in the State; or (2) in any other manner now or hereafter permitted by law. A private corporation may also be notified by publication and mail in like manner and with like effect as individuals." Ill. Rev. Stat. 1971, ch. 110, par. 13.3.

"Sec. 16. Personal service outside State.

(1) Personal service of summons may be made upon any party outside the State. If upon a citizen or resident of this State or upon a person who has submitted to the jurisdiction of the courts of this State, it shall have the force and effect of personal service of summons within this State; otherwise it shall have the force and effect of service by publication." Ill. Rev. Stat. 1971, ch. 110, par. 16(1).

"Sec. 17. Act submitting to jurisdiction—Process.

(1) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

(a) The transaction of any business within this State;

(b) The commission of a tortious act within this State;

* * *

(2) Service of process upon any person who is subject to the jurisdiction of the courts of this State, as provided in this Section, may be made by personally serving the summons upon the defendant outside this State, as provided in this Act, with the same force and effect as though summons had been personally served within this State.

(3) Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him is based upon this Section.

(4) Nothing herein contained limits or affects the right to serve any process in any other manner now or hereafter provided by law." Ill. Rev. Stat. 1971, ch. 110, par. 17.

In affirming the order denying Englebert's motion to quash, following a review of the authorities the appellate court said:

"Based on these authorities, we conclude that the phrase 'commission of a tortious act' as employed in the long-arm statute applies not only to an injury which occurs in Illinois, but also to all elements and conduct which significantly relate to or have significant causal connection with the injury suffered." 55 Ill. App. 3d 530, 535.

In *Braband v. Beech Aircraft Corp.* (1978), 72 Ill. 2d 548, we considered the question whether Beech Aircraft

was amenable to process in this State in an action for the wrongful deaths of two residents of Illinois who were killed when an airplane manufactured by Beech crashed in Canada. We noted that in *Shaffer v. Heitner* (1977), 433 U.S. 186, 53 L. Ed. 2d 683, 97 S. Ct. 2569, the Supreme Court had held "that the standards elucidated in *International Shoe Co. v. Washington* (1945), 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154, continued to be the test of a State's jurisdiction over a foreign corporation. The standards prescribed in *International Shoe Co.* are that 'due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' (326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158.)" 72 Ill. 2d 548, 553-54.

We quoted from *Shaffer v. Heitner* the Supreme Court's comment that:

"[T]he inquiry into the State's jurisdiction over a foreign corporation appropriately focused not on whether the corporation was 'present' but on whether there have been

'such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there.' [326 U.S. 310, 317, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158.]

Mechanical or quantitative evaluations of the defendant's activities in the forum could not resolve the question of reasonableness:

'Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly

administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations.' [326 U.S. 310, 319, 90 L. Ed. 95, 104, 66 S. Ct. 154, 160.]" 433 U.S. 186, 203-04, 53 L. Ed. 2d 683, 697, 97 S. Ct. 2569, 2580.

We reviewed this court's earlier opinion in *Nelson v. Miller* (1957), 11 Ill. 2d 378, wherein the court said:

"The foundations of jurisdiction include the interest that a State has in providing redress in its own courts against persons who inflict injuries upon, or otherwise incur obligations to, those within the ambit of the State's legitimate protective policy. The limits on the exercise of jurisdiction are not 'mechanical or quantitative' (*International Shoe Co. v. Washington,* 326 U.S. 310, 319 (1945),) but are to be found only in the requirement that the provisions made for this purpose must be fair and reasonable in the circumstances, and must give to the defendant adequate notice of the claim against him, and an adequate and realistic opportunity to appear and be heard in his defense." (11 Ill. 2d 378, 384.)

We agreed with the statement in *Nelson* that "Sections 16 and 17 of the Civil Practice Act reflect a conscious purpose to assert jurisdiction over nonresident defendants to the extent permitted by the due-process clause." 11 Ill. 2d 378, 389.

In *Gray v. American Radiator & Standard Sanitary Corp.* (1961), 22 Ill. 2d 432, this court said:

"As a general proposition, if a corporation elects to sell its products for ultimate use in

another State, it is not unjust to hold it answerable there for any damage caused by defects in those products. Advanced means of distribution and other commercial activity have made possible these modern methods of doing business, and have largely effaced the economic significance of State lines. By the same token, today's facilities for transportation and communication have removed much of the difficulty and inconvenience formerly encountered in defending lawsuits brought in other States.

Unless they are applied in recognition of the changes brought about by technological and economic progress, jurisdictional concepts which may have been reasonable enough in a simpler economy lose their relation to reality, and injustice rather than justice is promoted. Our unchanging principles of justice, whether procedural or substantive in nature, should be scrupulously observed by the courts. But the rules of law which grow and develop within those principles must do so in the light of the facts of economic life as it is lived today. Otherwise the need for adaptation may become so great that basic rights are sacrificed in the name of reform, and the principles themselves become impaired.

The principles of due process relevant to the issue in this case support jurisdiction in the court where both parties can most conveniently settle their dispute." 22 Ill. 2d 432, 442-43.

In support of its contention that to assert jurisdiction in this case would be violative of due process, Englebert argues that under *Hanson v. Denckla* (1958), 357 U.S. 235, 2 L. Ed. 2d 1283, 78 S. Ct. 1228, the requirements of due process are not satisfied unless a corporation has exercised the privilege of conducting activities within the

State and thereby enjoyed the benefits and protections of the laws of that State and that there has been no action on its part by which it purposely availed itself of the privilege of conducting activities within Illinois and thereby invoked the benefits and protections of its laws.

The "quality and nature of the activity" in which a foreign corporation must engage within a State in order to be subject to the jurisdiction of its courts has been the subject of much litigation. (See Annots., 19 A.L.R.3d 13 (1968), 24 A.L.R.3d 532 (1969).) The diametrically opposed and irreconcilable views on the question whether a manufacturer whose product has been distributed in a State by a third party is insulated from *in personam* jurisdiction under the due process clause of the fourteenth amendment in a product liability case because the sale and distribution of the product into the forum State was through an intermediary, rather than by the manufacturer, are well demonstrated by the majority and dissenting opinions in the cases of *Hudson v. Fehr Brothers, Inc.* (8th Cir. 1978), 584 F.2d 833, and *Hapner v. Rolf Brauchli, Inc.* (1978), 404 Mich. 160, 273 N.W.2d 822. We find persuasive the opinion of the Supreme Court of California in *Buckeye Boiler Co. v. Superior Court* (1969), 71 Cal. 2d 893, 458 P.2d 57, 80 Cal. Rptr. 113. In *Buckeye* the court held that engaging in economic activity within the State "as a matter of commercial actuality" (71 Cal. 2d 893, 902, 458 P.2d 57, 64, 80 Cal. Rptr. 113, 120) met the requirement of *Hanson v. Denckla* that there be purposeful activity within the State (357 U.S. 235, 253, 2 L. Ed. 2d 1283, 1298, 78 S. Ct. 1228, 1240). The court said:

> "A manufacturer engages in economic activity within a state as a matter of 'commercial actuality' whenever the purchase or use of its product within the state generates gross income for the manufacturer and is not so fortuitous or unforeseeable as to negative the existence of an

intent on the manufacturer's part to bring about this result. (See, e.g., *Gray v. American Radiator & Standard Sanitary Corp.* [22 Ill. 2d 432, 442]; *Metal-Matic, Inc. v. District Court,* 82 Nev. 263 [415 P.2d 617]; *DiMeo v. Minster Machine Co.,* 225 F. Supp. 569 [mere presence of product in state not enough to sustain jurisdiction]; Comment, *supra,* 63 Mich. L. Rev. 1028, 1033-1034; but see *Gill v. Surgitool, Inc.,* 256 Cal. App. 2d 583, 588 [64 Cal. Rptr. 207].)

A manufacturer's economic relationship with a state does not necessarily differ in substance, nor should its amenability to jurisdiction necessarily differ, depending upon whether it deals directly or indirectly with residents of the state. 'With the increasing specialization of commercial activity and the growing interdependence of business enterprises it is seldom that a manufacturer deals directly with consumers in other States. The fact that the benefit he derives from [their] laws is an indirect one, however, does not make [those laws] any the less essential to the conduct of his business; and it is not unreasonable, where a cause of action arises from alleged defects in his product, to say that the use of such products in the ordinary course of commerce is sufficient contact with [such states] to justify a requirement that he defend [there].' (*Gray v. American Radiator & Standard Sanitary Corp.* [22 Ill. 2d 432, 442].)

A manufacturer whose products pass through the hands of one or more middlemen before reaching their ultimate users cannot disclaim responsibility for the total distribution pattern of the products. If the manufacturer sells its products in circumstances such that it knows or

should reasonably anticipate that they will ultimately be resold in a particular state, it should be held to have purposefully availed itself of the market for its products in that state." 71 Cal. 2d 893, 902, 458 P.2d 57, 64, 80 Cal. Rptr. 113, 120.

Defendant Englebert's tires, introduced into the stream of commerce in obvious contemplation of their ultimate sale or use in other nations or States, came into Illinois on a regular basis and in substantial numbers, and we hold that its activities rendered it amenable to process under sections 13.3 and 16 of the Civil Practice Act. Given the nature and quality of its activities, we hold further that Englebert has purposefully invoked the benefits and protections of the law of Illinois, that as required by *International Shoe* and *Shaffer* there were present "such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there" (326 U.S. 310, 317, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158; 433 U.S. 186, 203, 53 L. Ed. 2d 683, 697, 97 S. Ct. 2569, 2580), and that requiring it to defend this action does not offend "traditional notions of fair play and substantial justice" (326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158). The judgment of the appellate court affirming the order of the circuit court denying Englebert's motion to quash the service of summons is affirmed. We do not reach the question whether defendant committed a tortious act in Illinois within the contemplation of section 17(1)(b) of the Civil Practice Act and express no opinion concerning the correctness of the appellate court's holding on that issue.

We consider next whether the appellate court erred in reversing the order of the circuit court denying Uniroyal's motion for summary judgment. Plaintiff contends that the

"same principles which justify liability for wholesalers and retailers (who are components of the distributive chain 'downstream' from the manufacturer) compel liability on the part of the entity which bears overall responsibility for the entire enterprise which produces and markets the product—the 'upstream' parent under whose aegis the entire enterprise functions." Plaintiff bases this conclusion on the following assertions: "(1) Uniroyal sits at the pinnacle of the enterprise which produced the tire in question; (2) Uniroyal authorized the use of its trademark and trade name on the product in question, and thereby lent its good will and at least the appearance of responsibility for the product; (3) As one component of the Uniroyal enterprise, UEB [Englebert] and its products directly or indirectly affect the corporate financial health of the Uniroyal enterprise, and the profits from the sales of this and other UEB [Englebert] products ultimately enure to the benefit of Uniroyal [;] [and] (4) Uniroyal had the right to exercise control over the manufacturing and marketing of UEB [Englebert] products, including the tire in question."

It appears from Uniroyal's motion for summary judgment, the affidavits, and answers to interrogatories that at the time the tire in question was manufactured a wholly owned subsidiary of Uniroyal owned approximately 95%, and presently owns approximately 96%, of the outstanding shares of Englebert; that in 1966, Englebert Societe Anonyme became known as Uniroyal Englebert Belgique, S.A.; that in 1964 Uniroyal granted Englebert the nonexclusive license to use its registered trade name, "UNIROYAL"; and that in a contract, dated October 1, 1962, between Uniroyal [formerly known as United Rubber Co.] and Englebert, Uniroyal was to make available to Englebert detailed information as to the methods, processes and formulas used in the manufacture of tires and tubes and other products manufactured by

Uniroyal. Also included was a provision whereby Uniroyal would supply technical services and instruction to Englebert, including recommendations and assistance in purchasing equipment, processes to improve operations, supplying of specifications, including testing procedure, and information concerning the construction of the products covered by the agreement, including "patterns and prints where necessary to describe constructions." Englebert was free to send representatives to visit Uniroyal's plant and investigate manufacturing methods and processes and formulas used in those plants. The agreement also provided for quarterly payments to Uniroyal and that Englebert "in its advertising *** may publicize *** the facts that in its manufacturing practices it practices and employs the manufacturing and technical methods used in the United States by [Uniroyal] and that Englebert adopted these methods after investigation and study of manufacturing and technical methods followed by manufacturers in the most promising and progressive." Englebert was required to permit Uniroyal's representatives "to have knowledge at all times of the goods and manufacturing operations *** associated with its business identified with the trademark and logo," and under certain conditions preference was to be accorded Uniroyal in Englebert's purchases of materials produced by Uniroyal.

It appears further that Englebert maintained its own books and accounts separate and distinct from Uniroyal, had its own banking sources and line of credit, and did not share common manufacturing facilities, offices, addresses, telephone numbers or employees with Uniroyal; that there were no employees of Uniroyal at Englebert's plant in Belgium and Uniroyal had no control or direction over the production at that plant; that Englebert's liability insurance policy was separate and distinct from any insurance maintained by Uniroyal; and that there had never been any joint meetings of the separate boards of the directors of

Uniroyal and Englebert. Uniroyal also stated that it has never advertised for sale any product produced by Englebert and was never in possession of the tire here involved; that all records which may exist relating to the tire have been in the exclusive possession of Englebert; and that Uniroyal has made no warranty of any kind to any person with respect to this tire.

The appellate court held that despite Uniroyal's substantial ownership of Englebert's stock the two corporations had always operated as separate entities and there was no basis to impose vicarious liability on Uniroyal. (55 Ill. App. 3d 530, 540.) We agree. We find nothing in the pleadings, depositions or answers to interrogatories which persuades us that the relationship between these two corporations arising out of stock ownership or representation on the board of directors provided a sufficient basis for the imposition of vicarious liability on Uniroyal.

We consider next the question whether, as contended by plaintiff, the doctrine of strict liability approved in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, is applicable to Uniroyal on the basis that the allegedly defective tire bore its trademark.

In *Suvada* the court said:

"In addition to the manufacturer, liability in tort for a defective product extends to a seller, (*Lindroth v. Walgreen Co.* 407 Ill. 121,) a contractor, (*Paul Harris Furniture Co. v. Morse*, 10 Ill. 2d 28,) and a supplier, (*Watts v. Bacon & Van Buskirk*, 18 Ill. 2d 226,) one who holds himself out to be the manufacturer, (*Lill v. Murphy Door Bed Co.* 290 Ill. App. 328,) the assembler of parts (*Rotche v. Buick Motor Co.* 358 Ill. 507) and the manufacturer of a component part. (*Gray v. American Radiator and Standard Sanitary Corp.* 22 Ill. 2d 432.) Lack of privity of contract not being a defense in a tort

action against the manufacturer, it is not a defense in an action against any of these parties." (32 Ill. 2d 612, 617.)

In *Dunham v. Vaughan & Bushnell Mfg. Co.* (1969), 42 Ill. 2d 339, the court held that strict liability applied to the wholesaler defendant "despite the fact that the box in which this hammer was packaged passed unopened through Belknap's [the wholesaler's] warehouse." (42 Ill. 2d 339, 344.) Our decision in *Crowe v. Public Building Com.* (1978), 74 Ill. 2d 10, confirms that the doctrine of strict liability applies not only to the lessor, but also to the former lessor of a defective product.

In support of his argument plaintiff cites Restatement (Second) of Torts, section 400 (1965), which provides:

"One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."

Cases cited by plaintiff in which the owner of a trademark has been held liable for a defective product manufactured by another are *Wojciuk v. United States Rubber Co.* (1961), 13 Wis. 2d 173, 108 N.W.2d 149, *Forry v. Gulf Oil Corp.* (1968), 428 Pa. 334, 237 A.2d 593, *Dudley Sports Co. v. Schmitt* (1972), 151 Ind. App. 217, 279 N.E.2d 266, and *Carter v. Joseph Bancroft & Sons Co.* (E.D. Pa. 1973), 360 F. Supp. 1103, and cases collected at 51 A.L.R.3d 1344 (1973).

Uniroyal responds that section 400 of the Restatement is not here applicable because Uniroyal was not a seller of the tire, and that in all the cases cited by plaintiff the owner of the trademark held liable had in some manner constituted a link in the chain of the product's distribution. From this, defendant argues, that absent some participation in the chain of distribution defendant cannot be held liable.

Although it appears that in the cases cited by plaintiff the defendants participated in the distribution of the

product, we do not consider that such participation is an essential element in order that the doctrine of strict liability apply. Nor do we agree that in *Forry v. Gulf Oil Corp.* (1968), 428 Pa. 334, 237 A.2d 593, and *Carter v. Joseph Bancroft & Sons Co.* (E.D. Pa. 1973), 360 F. Supp. 1103, such participation was found to be an essential element. The seller in *Forry* was Gulf Tire and Supply Co., and a careful reading of the opinion shows that the court drew no distinction between that corporation and Gulf Oil Corporation, whose trademark the tire in that case bore. In *Carter* it does not appear that the liability of defendants, Indiana Head, Inc., and Joseph Bancroft & Sons Co., arose from actions other than licensing the use of the trademark "Ban-Lon."

In *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1975), 62 Ill. 2d 77, 82, the court said, "The major purpose of strict liability is to place the loss caused by defective products on those who create the risk and reap the profit by placing a defective product in the stream of commerce, regardless of whether the defect resulted from the 'negligence' of the manufacturer." 62 Ill. 2d 77, 82.

A licensor is an integral part of the marketing enterprise, and its participation in the profits reaped by placing a defective product in the stream of commerce (2 J. Dooley, Modern Tort Law sec. 32.67, at 340 (1977)) presents the same public policy reasons for the applicability of strict liability which supported the imposition of such liability on wholesalers, retailers and lessors. The societal purposes underlying *Suvada* mandate that the doctrine be applicable to one who, for a consideration, authorizes the use of his trademark, particularly when, as here, the product bears no indication that it was manufactured by any other entity. The fact that the defendant may not have been a link in the chain of distribution is wholly irrelevant, for as the court, referring to a seller,

contractor or supplier, said in *Suvada,* "Lack of privity of contract not being a defense in a tort action against the manufacturer, it is not a defense in an action against any of these parties." 32 Ill. 2d 612, 617.

In *Econo Lease, Inc. v. Noffsinger* (1976), 63 Ill. 2d 390, 393, the court said:

"A motion for summary judgment will be granted if the pleadings, depositions, admissions and affidavits on file reveal that there is no genuine issue as to any material fact and that the movant is entitled to a judgment or decree as a matter of law. (Ill. Rev. Stat. 1975, ch. 110, par. 57(3); *Carruthers v. B.C. Christopher & Co.,* 57 Ill. 2d 376.) A reviewing court must reverse an order granting summary judgment if it is determined that a material question of fact does exist."

Because we have held that defendant Uniroyal's participation in the chain of distribution is not an essential element of strict liability, we are unable to say that there are no material questions of fact presented by this record.

For the reasons stated, insofar as it reversed the order of the circuit court denying defendant Uniroyal's motion for summary judgment, the judgment of the appellate court is reversed. The orders of the circuit court are affirmed, and the cause is remanded to that court for further proceedings consistent with this opinion.

> *Appellate court affirmed in part and reversed in part; circuit court affirmed; cause remanded.*