The QUAKER OATS COMPANY, a New Jersey Corporation, Plaintiff,

v.

CHELSEA INDUSTRIES, INC., a Delaware Corporation, Irish Dairy Board (An Bord Bainne Co-operative, Limited), a Corporation of Ireland, and North Kerry Milk Products, Ltd., a Corporation of Ireland, Defendants.

No. 77 C 2504.

United States District Court, N. D. Illinois, E. D.

July 23, 1980.

Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., for plaintiff.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendants.

MEMORANDUM OPINION

FLAUM, District Judge:

This matter comes before the court on the motions of defendants North Kerry Milk Products, Ltd. ("North Kerry") and Irish Dairy Board (the "Board") to dismiss the amended complaint. For the reasons set forth below, the motions to dismiss are denied.

On July 12, 1977 plaintiff brought this action against Chelsea Industries, Inc. ("Chelsea"). On April 25, 1978 Chelsea filed a third party complaint against the

Board. Thereafter, on July 10, 1978 plaintiff amended its complaint and added as defendants the Board and North Kerry.

The amended complaint alleges, *inter alia*, that plaintiff bought a quantity of sodium caseinate, which it used in the manufacture of LIFE cereal, from Chelsea; that Chelsea bought casein, an ingredient used in the manufacture of sodium caseinate, from the Board; that the Board obtained the casein from North Kerry; and that plaintiff was forced to destroy a large portion of LIFE cereal when plaintiff discovered a defect in the sodium caseinate which was caused by the casein from which it was manufactured. The Board and North Kerry moved to dismiss on the ground that the court lacks jurisdiction over the person, pursuant to rule 12(b)(2), Fed.R. Civ.P.

The limit to which jurisdiction over foreign corporations may be asserted is set out in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In *International Shoe* the Supreme Court stated:

> due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. at 158.[1]

The Supreme Court then went on to note:

> the criteria by which we mark the boundary line between those activities which

justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. . . Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. 326 U.S. at 319, 66 S.Ct. at 160.

Since the cause of action in *International Shoe* arose out of activities conducted in the forum state out of which obligations arose, the Supreme Court held that

> a procedure which requires the corporation to respond to a suit brought to enforce them [the obligations] can, in most instances, hardly be said to be undue. 316 U.S. at 319, 66 S.Ct. at 160.

The Supreme Court has addressed when a state may entertain a cause of action against a foreign corporation where the cause of action does not arise out of the corporation's activities in the state of the forum. In *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 445–46, 72 S.Ct. 413, 418, 96 L.Ed. 485 (1951), the Supreme Court concluded that if a corporation carries on in a state continuous and systematic corporate activities,

> those activities are enough to make it fair and reasonable to subject that corporation to proceedings *in personam* in that state, at least insofar as the proceedings *in personam* seek to enforce causes of action relating to those very activities or to other activities of the corporation within the state.

> it in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute . . . ; the plaintiff's interest in obtaining convenient and effective relief, . . . at least when that interest is not adequately protected by the plaintiff's power to choose the forum, . . . ; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies . . . .

1. In *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980), the Supreme Court expanded on this statement:

> The concept of minimum contacts . . . can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.
>
> The protection against inconvenient litigation is typically described in terms of "reasonableness" or "fairness." . . . Implic-

In *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), where the cause of action did not arise out of an act done or a transaction consummated in the forum state, the Supreme Court reiterated:

> it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

■ Thus, where the business done by a foreign corporation in the state of the forum is of a sufficiently substantial nature, the state may entertain a suit against the foreign corporation even though the cause of action arose from activities entirely distinct from its conduct within the state. However, where such business or other activity is not substantial, the particular act or transaction having no connection with the state of the forum, the "minimum contacts" requirement of *International Shoe* is not satisfied. *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761, 764 (1961).

■ Assuming compliance with federal due process, it is for the state to determine whether it will choose to take jurisdiction over the foreign corporation. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. at 448, 72 S.Ct. at 419–420; *Braband v. Beech Aircraft Corp.*, 72 Ill.2d 548, 21 Ill. Dec. 888, 891–892, 382 N.E.2d 252, 255–56

(1978), *cert. denied*, 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979); *See St. Louis–San Francisco Railway Co. v. Gitchoff*, 68 Ill.2d 38, 11 Ill.Dec. 598, 600, 369 N.E.2d 52, 54 (1977). It is established that Illinois intends to assert jurisdiction over nonresident defendants to the extent permitted by the due process clause. *Connelly v. Uniroyal, Inc.*, 75 Ill.2d 393, 27 Ill.Dec. 343, 347, 389 N.E.2d 155, 159 (1979), *cert. denied*, 444 U.S. 1060, 100 S.Ct. 992, 62 L.Ed.2d 738 (1980); *Nelson v. Miller*, 11 Ill.2d 378, 143 N.E.2d 673, 679 (1957). The Board and North Kerry contend that the court lacks jurisdiction over the person because the causes of action did not arise either from the transaction of business or from the commission of a tortious act within Illinois, pursuant to section 17(1)(a) and (b) of the Civil Practice Act, Ill.Rev.Stat. ch. 110, § 17(1)(a), (b) (1977),[2] and because their activities do not render them amenable to process under sections 13.3 and 16 of the Civil Practice Act, Ill.Rev.Stat. ch. 110, §§ 13.3,[3] 16[4] (1977). Since the court concludes that the Board and North Kerry are amenable to process under section 13.3 and 16, it need not address whether the causes of action arose from either the transaction of business or the commission of a tortious act within the state of Illinois.

■ The Board is a corporation organized and existing under the laws of the Republic of Ireland and has its principal place of business in Dublin, Ireland. It has no office, agent or representative in the United States. It has a bank account in New York

**2.** Ill.Rev.Stat. ch. 110, § 17(1) provides in pertinent part:

> Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:
> (a) The transaction of any business within this State;
> (b) The commission of a tortious act within this State . . . . .

**3.** Ill.Rev.Stat. ch. 110, § 13.3 provides:

> A private corporation may be served (1) by leaving a copy of the process with its registered agent or any officer or agent of said

corporation found anywhere in the State; or (2) in any other manner now or hereafter permitted by law. A private corporation may also be notified by publication and mail in like manner and with like effect as individuals.

**4.** Ill.Rev.Stat. ch. 110, § 16 provides in pertinent part:

> "(1) Personal service of summons may be made upon any party outside the State. If upon a citizen or resident of this State or upon a person who has submitted to the jurisdiction of the courts of this State, it shall have the force and effect of personal service of summons within this State; otherwise it shall have the force and effect of service by publication."

but not in Illinois. Negotiations regarding the salé of casein to Chelsea took place in Dublin, Ireland. The casein was shipped from Ireland to Philadelphia, Pennsylvania and then trucked to New Jersey where it was picked up by Chelsea. While the casein sold to Chelsea by the Board may not have resulted in either the transaction of business or the commission of a tortious act within the state of Illinois, the Board did carry on continuous and systematic activities in the state of Illinois. From January 1, 1975 through December 31, 1977 the Board sold to persons and companies located in Illinois 4,136 metric tons of chocolate crumb [5] and 30 metric tons of casein. Furthermore, in connection with the sale of chocolate crumb, representatives of the Board were present in Illinois on three occasions.[6]

North Kerry is a corporation incorporated under the laws of the Republic of Ireland and does business in Listowel, County Kerry, Ireland. From 1974 through 1977 North Kerry was not qualified or licensed to do business in Illinois, did not maintain any office or other facility in Illinois, was not listed in any Illinois telephone books or trade directories, did not maintain any bank accounts in Illinois, and did not own any real or personal property located in Illinois. However, from January 1, 1974 through December 31, 1977 North Kerry sold to persons and companies located in Illinois 2,601 long tons of casein [7] and six individuals made several visits to Illinois on behalf of North Kerry to meet with representatives of customers located in Illinois.[8]

The business done in Illinois by the Board and by North Kerry is sufficiently substantial so that due process is not offended by assertion of jurisdiction over these foreign corporations in a cause of action arising from out–of–Illinois activities. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. at 445–47, 72 S.Ct. at 418–419; *St. Louis– San Francisco Railway Co. v. Gitchoff*, 11 Ill.Dec. at 600, 369 N.E.2d at 54. Furthermore, to the extent that their business is directly affected by transactions occurring in Illinois, they enjoy benefits from the laws of Illinois. *Hanson v. Denckla*, 357 U.S. at 253, 78 S.Ct. at 1239–1240; *Gray v. American Radiator & Standard Sanitary Corp.*, 176 N.E.2d at 766. Since the Board and North Kerry are amenable to process under sections 13.3 and 16 of the Civil Practice Act, this court has jurisdiction over them.

Accordingly, the motions of the Board and North Kerry to dismiss are denied.

It is so ordered.

---

5. During 1975 1,178 metric tons, during 1976 1,878 metric tons, and during 1977 1,080 metric tons were sold to persons and companies located in Illinois.

6. In-between January 1, 1975 and August 17, 1978 Board representatives visited Illinois six times to call on customers or prospective customers.

7. During 1974 1,529 long tons, during 1975 637 long tons, and during 1976 435 long tons were

sold to persons and companies located in Illinois.

8. Furthermore, from January 1, 1974 through December 31, 1977 an Illinois resident served on North Kerry's board of directors and since April 1, 1977 two individuals employed by, or holding any position with, North Kerry have been directors of an Illinois corporation and one such individual has been an officer of that Illinois corporation.