**IRAGORRI**

v.

**UNITED TECHNOLOGIES CORP.,**
**Otis Elevator Co.**

No. 3:94CV01673(JBA).

United States District Court,
D. Connecticut.

Sept. 30, 2003.

---

Anthony J. Natale, James G. Green, Jr., Jodi Lynn Zils Gagne, Michael A. Fusco, Pepe & Hazard, Susan Kim, Bingham McCutchen, Hartford, CT, for Plaintiff.

Allan B. Taylor, Charlsa D. Broadus, Day, Berry & Howard, Hartford, CT, Edward T. Falsey, III, Edward W. Mayer, Jr., Delaney, Zemetis, Donahue, Durham & Noonan, Wallingford, CT, Patrick M. Noonan, Delaney, Zemetis, Donahue, Durham & Noonan, Guilford, CT, for Defendants.

U.S. Court of Appeals, Office of the Clerk, New York City, Notice only.

### Ruling on Defendants' Motion for Summary Judgment
### [Doc. # 169]

ARTERTON, District Judge.

Defendants United Technologies Corporation and Otis Elevator Company have filed a motion for summary judgment on

all counts in plaintiffs' amended complaint. For the reasons set forth below, defendants' motion for summary judgment is granted.

## I. Background

On October 3, 1992, Mauricio Iragorri ("Mr.Iragorri") fell to his death down an empty elevator shaft in Cali, Colombia, after a repair person employed by International Elevator, Inc. ("International") propped open the elevator door with a screwdriver and left the entranceway unattended and unbarricaded, while the elevator car was not in place. Mr. Iragorri's surviving spouse, Haidee Iragorri ("Mrs.Iragorri"), brought suit against United Technologies Corporation and Otis Elevator Company, both on her own behalf and as the Ancillary Administratix of the Estate of Mauricio Iragorri on behalf of decedent's survivors, including Mrs. Iragorri and decedent's two minor children, Patricia Iragorri and Maurice Iragorri.

Plaintiffs' amended complaint alleges four causes of action, each with two derivative claims. [Doc. # 144]. Counts 1–3 allege violations by Otis Elevator and United Technologies of Connecticut's Product Liability Act, Conn. Gen.Stat. § 52–572m. [Doc. # 144] at 6–17. Counts 4–6 allege that Otis Elevator negligently carried out its duty to oversee, manage, and supervise the work of its contractors, authorized distributors and subsidiaries. [Doc. # 144] at 17–23. Counts 7–9 allege that International (the company that maintained and repaired the elevator in question) and OTESA (the company that installed the elevator in question) were negligent in their duties, and claim that the negligence of International and OTESA is attributable to Otis Elevator on a principal/agent theory. [Doc. # 144] at 23–27. Counts 10–12 allege recklessness on the part of International and OTESA, and seek to attribute the recklessness to Otis Elevator as their principal. [Doc. # 144] at 27–31. As alleged in the amended complaint, these violations resulted in the wrongful death of Mr. Iragorri (Counts 1, 4, 7, and 10), Mrs. Iragorri's loss of consortium with her husband (Counts 2, 5, 8, and 11), and Patricia and Maurice's loss of consortium with their father (Counts 3, 6, 9, and 12).

Defendants seek summary judgment on the entire complaint, arguing that there is no genuine issue of material fact in dispute and that, as a matter of law, plaintiff's claims are not viable. On the first three counts, defendants argue that Otis is not the "product seller" and thus the Connecticut Product Liability Act does not apply to it. As to counts 4–6, defendants assert that the claims are barred by the statute of limitations, because plaintiffs did not raise a direct negligence cause of action against Otis in their original complaint. Defendants also argue that Otis was under no duty to supervise or assist the Colombian companies, and that any breach of such a duty was not the proximate cause of Mr. Iragorri's death. Finally, with regard to the claims of vicarious liability in Counts 7–12, defendants assert that there is no evidentiary basis for a finding that International or OTESA were agents of Otis.

For the purposes of the summary judgment motion, the following facts are not in dispute.

1. The companies: Otis Elevator Company ("Otis") is a New Jersey Corporation that, since 1976, has been a subsidiary of United Technologies Corporation ("UTC"), a Delaware Corporation. *See* Hseih Aff. [Doc. # 180, Ex. 3]. Otis is headquartered in Farmington, Connecticut, and UTC is headquartered in Hartford, Connecticut. *Id.* In 1924, Otis began expanding its international presence, and incorporated a subsidiary corporation in Maine ("Otis

Maine") in order to facilitate its business in foreign countries. *See* [Doc. # 176, Ex. 4]. By 1987, Otis Maine had a branch office in Colombia, which was supported by a Headquarters staff located in Palm Beach Gardens, Florida. *See* Duquenoy Dep. [Doc. # 176, Ex. 8] at 28. At this time, however, Otis began restructuring its Latin American business, selling most of Otis Maine's South American operations to local management, and eliminating the headquarters staff that provided overhead services and technical support to the Latin American entities. *See* Pease Memo [Doc. # 176, Ex. 7]; Duquenoy Dep. [Doc. # 176, Ex. 8] at 21–23. On October 12, 1987, Otis entered into a Purchase and Sale Agreement to sell all of the shares of Otis Maine to local Colombian management, and, after Otis had removed all non-Colombian assets from the company, to rename the company International Elevator Corporation ("International"). *See* Purchase and Sale Agreement [Doc. # 177, Ex. 14]. The purchase price was $40, plus Otis' agreement to maintain at least a $1.5 million annuity contract to satisfy pension obligations for employees of the Colombian corporation who retired on or before the closing on July 15, 1988. *See* Purchase and Sale Agreement, §§ 1.01, 1.03, 4.10, 8.01 [Doc. # 177 Ex. 14] at 4544, 4549, 4553–4554. In June 1988, the Colombian National Planning Department approved the purchase of International Elevator. Otis subsequently entered into a Supply Agreement [Doc. # 177, Ex. 15], a Technical Assistance Agreement [Doc. # 177, Ex. 22], and a Licensing Agreement [Doc. # 177, Ex. 18] with International, and International's focus turned primarily to the maintenance and modernization of Otis equipment. *See* Royalty Committee Application, [Doc. # 176, Ex. 11] at 4095. Otis conducted field audits of International's operations in 1986, 1989, and 1991. *See* [Doc. # 180, Ex. 4].

Also in 1987, former Otis employees in Columbia formed a separate corporation, Organizacion Técnica De Elevadores, S.A. ("OTESA"). *See* Royalty Committee Application, [Doc. # 176, Ex. 13] at 4256. OTESA's primary work involved the assembly and installation of Otis elevators in Colombia. Like International, OTESA entered into Supply, Technical Assistance, and Licensing Agreements with Otis. *See* [Doc. # 177, Ex. 21]; [Doc. # 177, Ex. 23]; [Doc. # 177, Ex. 19]. These agreements were nearly identical in form to the agreements between Otis and International.[1]

Otis has a Brazilian subsidiary, Elevadores Otis Ltda. ("Otis Brazil"), incorporated under the laws of Brazil, that is one of the anchors of Otis' Latin American operations. Otis owns 99.9999968% of the shares of Otis Brazil. *See* [Doc. # 176, Ex. 1]. Since 1988, Otis Brazil has had its own board of directors, its own working capital, and its own facilities, including factories. *See* Prunes Aff., [Doc. # 176, Ex. 2]. Otis Brazil currently has 1,800 employees, which it pays from its own funds, and in 1992 it had approximately 3,000 employees paid from its own funds. *See id.* Otis supervised Otis Brazil's facilities through the use of annual field quality audits [Doc. # 180, Ex. 17], and undertook a series of agreements with Otis Brazil, including a Trademark License Agreement, a Patent Agreement and License to Use Patents, and a Technology Agreement and License to Use Technical Data Know–How. *See* [Doc. # 180, Ex. 18]. In 1987, Otis Brazil was appointed a "Supervising Company" of Otis' export market in Latin America, "re-

---

**1.** The contracts were identical to those Otis had with International in all relevant respects. For ease of reference, all citations to these agreements in this opinion will be to the agreements between Otis and International.

sponsible for the implementation of all Otis LAO [Latin American Operations] policies and strategies in these markets." *See* McMahon Memo [Doc. # 180, Ex. 7] at 5208, 5211.

2. The incident: The elevator that was under repair when Mr. Iragorri fell to his death was identified as Model LA692, and was ordered by OTESA from Otis Brazil in May 1990. *See* Sales Statement [Doc. # 177, Ex. 30]. OTESA installed the elevator in the Portada Del Mar apartment complex in Cali, Colombia, and retained International to service the elevators in the complex. *See* Pombo Aff. [Doc. # 177, Ex. 32, at ¶¶ 11–12]; *see also* [Doc. # 177, Ex. 33]. On Oct. 2, 1992, Gerardo Ortiz Osorio, an International employee, came to repair the elevator in question, and left an elevator door on the fifth floor jammed open with a screwdriver. *See* Def. Br. at 16 ("For the purposes of this motion only, defendants do not dispute that claim."); Garcia Dep. [Doc. # 180, Ex. 2] at 24–25; Gonzalez Zamorano Letter Unofficial Translation [Doc. # 180, Ex. 24] at 5185. Mr. Iragorri, who was visiting his mother on the fifth floor of the building, fell down elevator shaft and died of his injuries.

Defendants assert that Otis Brazil designed and built the LA692 model, and that none of the component parts of the elevator in question were manufactured or sold by Otis. Defendants also state that the order for the elevator in question was on a CKD basis, which means it was an order for elevator components, not a complete elevator, and thus the components Otis Brazil sold to OTESA did not include elevator entrance door panels, the cab panels, the cab front columns, or other such parts. According to the defendants, OTESA manufactured or locally obtained the other components.

Plaintiffs dispute defendants' claim that Otis had no involvement in the manufacture or sale of the LA692 elevator, claiming instead that Otis, from its Latin American Operations, managed and controlled Otis Brazil. Plaintiffs also dispute Otis' characterization of a CKD order, and deny that OTESA manufactured or locally obtained the component parts of the LA692 elevator installed at Portada Del Mar. Finally, plaintiffs deny that Otis had no ownership interest in International or OTESA.

## II. Analysis

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In moving for summary judgment against a party who will bear the burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."). In order to defeat summary judgment, the non-moving party must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

When deciding a motion for summary judgment, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, "[w]hen a motion for summary judgment is made and supported as provided in [the Federal Rules], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R.Civ.P. 56(e). Instead, the party opposing summary judgment must set forth the specific facts in affidavit or other permissible evidentiary form that demonstrate a genuine issue for trial. *See id.*

### B. Products Liability Claim

■ Defendants' argument in support of summary judgment against plaintiff's products liability claim is straightforward. They contend that the Connecticut Product Liability Act applies only to "product sellers," and that neither Otis nor UTC sold the elevator at issue. According to the defendants, major components of the elevator were manufactured by Otis Brazil, a wholly-owned subsidiary of Otis, and other components were manufactured or obtained by OTESA. They claim that OTE-SA bought the elevator components on a CKD basis from Otis Brazil, assembled the remaining parts, and in turn sold the completed elevator to the Portada Del Mar apartment complex. Plaintiffs challenge the conclusion that Otis was not a "product seller," and also argue that Otis may be held liable as the apparent manufacturer of the elevator, regardless of its role in the sale of the elevator.[2]

Under Connecticut's Product Liability Act, Conn. Gen.Stat. § 52–572n(a)(2001), "[a] product liability claim ... may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." The term "product seller" is defined by statute as "any person or entity, including a manufacturer, wholesaler, distributer or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption." Conn. Gen.Stat., § 52–572m(a)(2001).

Here, plaintiffs have presented no evidence to support their contention that Otis placed the elevator in the stream of commerce, or to counter defendants' evidence that the elevator in question was manufactured by Otis Brazil with additional components manufactured either by OTESA or elsewhere locally in Colombia, and was sold by Otis Brazil to OTESA and in turn

---

**2.** Defendants also claim that "to the extent that plaintiffs rely on claims assigning responsibility to Otis for the actions of Otis Brazil, the claims are time-barred," because there is a three year statute of limitations under Conn. Gen. St. § 52–577a(a). Defendants state that Otis Brazil was not mentioned in the original complaint, and that plaintiffs did not amend the complaint to include Otis Brazil until February 2002, even though plaintiffs were aware that the elevator was manufactured and sold by Otis Brazil no later than January 24, 1995. *See* Defs.' Mem. Supp. Summ. J. [Doc. # 170] at 22. Moreover, defendants assert that since plaintiffs' claim is based on new factual issues about the relationship between Otis and Otis Brazil, it does not relate back to the filing of the original complaint. *See id.* This argument is spurious because plaintiffs have not added Otis Brazil as a defendant. The original complaint clearly sought to hold Otis responsible for a defective product under the Connecticut Product Liability Act, which is exactly the claim plaintiffs continue to make. Moreover, plaintiff's apparent manufacture argument is not at all contingent on Otis Brazil's involvement. *See infra* discussion of statute of limitations and relation back principle.

to the Portada Del Mar apartment building.[3] Instead, plaintiffs argue two points: (1) that the Otis trademark that appeared on the elevator in question has significance under the CPLA, *see* Pls.' Mem. L. Opp. Summ. J. [Doc. # 180] at 7; and (2) that "[f]rom its Latin American Operations, Otis managed and controlled Otis Brazil." *See* Plaintiff's Local Rule 9(c)(2) Counter-Statement [Doc. # 171] at ¶ 1.

The first argument is unpersuasive. Plaintiffs point to § 52–572m(e) of the statute, which defines "manufacturer" as "a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer." But under the express terms of the statute, the CPLA applies only to "product sellers," which are defined to include "manufacturers ... engaged in the business of selling ...." § 52–572n(a); § 52–572m(a). Thus, without more, the fact that the Otis trademark was on the elevator in question is not sufficient to turn Otis into a seller of the product. The Connecticut Supreme Court addressed a nearly identical issue in *Burkert v. Petrol Plus of Naugatuck*, 216 Conn. 65, 72, 579 A.2d 26 (1990). There, the issue was whether GM, the trademark licensor of automatic transmission fluid, could be held liable as a "product seller" under the Connecticut Product Liability Act. The Court found that "GM did no more than allow others to use its Dexron® II trademark in the production, marketing and distribution of transmission fluid. Absent any further involvement in the stream of commerce, we conclude that a trademark licensor is not a seller under the Product Liability Act." *Id.* Likewise, here, Plaintiffs offer no additional evidence that Otis was engaged in the actual manufacture, distribution, or marketing of the elevators, or that the Supply, Technical Assistance, and Licensing Agreements gave Otis a role in such matters.

Plaintiff's second claim, that Otis "managed and controlled Otis Brazil," lacks evidentiary support, as the record shows merely that Otis Brazil was a wholly owned subsidiary of Otis, and the evidence the plaintiffs point to does not demonstrate Otis management of Otis Brazil. *See* Pl.'s Mem. L. Opp. Summ. J. [Doc. # 180] at 8–10 (citing Trademark License Agreement between Otis and Otis Brazil and evidence of Field Quality Audits conducted by Otis of Otis Brazil facilities). "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct.

---

**3.** Although plaintiffs assert that Otis itself manufactured parts of the elevator in question, and dispute the defendants' contention that OTESA, or another local Colombian manufacturer, produced the remaining components of the elevator not supplied by Otis Brazil, they do not offer any evidence in support of their position. Defendants, in contrast, have presented an order slip in Portuguese showing the order for model LA–692 elevators to be sent to the Portada Del Mar apartments in Colombia, *see* [Doc. # 177, Ex. 30], and an affidavit from the head of engineering at Otis Brazil stating that the "LA 692 model of elevator was designed and produced by Otis Brazil," and that "[n]one of its parts was manufactured or sold by Otis Elevator Company of New Jersey." *See* Thomazini Aff., [Doc. # 177, Ex. 31] at ¶ 5. Defendants provide only speculative evidence that OTESA locally produced the other components of the elevator in question, *see* Thomazini Aff., [Doc. # 177, Ex. 31] at ¶ 7, and thus do not conclusively prove that Otis did not produce any of the component parts. But a "defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiffs must prove at trial. It need only point to an absence of proof on plaintiff's part ...." *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir.2001).

1876, 141 L.Ed.2d 43 (1998) (citations omitted); *see also SFA Folio Collections, Inc. v. Bannon*, 217 Conn. 220, 232, 585 A.2d 666 (1991) (" '[T]he parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary and the two enterprises have identical directors and officers.' ")(quoting H. Henn & J. Alexander, Laws of Corporations (3d Ed.1983) § 148, at 355). Plaintiffs, then, can only prevail under the CPLA if there is some additional evidence that would render it appropriate to "pierce the corporate veil" and hold Otis accountable for the actions of Otis Brazil. Plaintiffs do not contend that the corporate veil should be pierced in this case, and there is no evidence to support such a claim.[4]

 Plaintiffs also argue that even if the CPLA does not apply, then they can still prevail on a common law theory of apparent manufacture, because the elevator in question bore the Otis trademark.[5] Defendants note in their reply that plaintiffs did not plead the common law "apparent manufacturer" theory, as Counts 1–3 of the amended complaint clearly state that they are based on the "Product Liability Act," and "the phrase 'apparent manufacturer' or anything similar to it never appears in the Amended Complaint." Def.'s Reply Mem. [Doc. # 182] at 4. Plaintiffs did, however, make a claim of direct negligence against Otis in its Amended Complaint (Counts 4–6), and did state that Otis "designed, manufactured, sold, and/or serviced and maintained" the elevators at Portada del Mar, Amended Complaint, [Doc. # 144] at ¶ 16, which should have provided notice to the defendants of the

---

**4.** Generally, piercing the corporate veil is proper only "in exceptional circumstances" when "(1) such unity of ownership and interest exists that the two affiliated corporations have ceased to be separate and the subsidiary has been relegated to the status of the 'alter ego' of the parent; and (2) where recognition of them as separate entities would sanction fraud or lead to an inequitable result." *SFA Folio Collections, Inc. v. Bannon*, 217 Conn. 220, 229 n. 8, 230–31, 585 A.2d 666 (1991) (citations and internal quotation marks omitted).

Based on the evidence in the record, it is not appropriate to pierce the corporate veil in this case. According to defendants' affidavits, Otis Brazil, while wholly owned by Otis, maintained a completely separate board of directors, had no overlapping officers, and operated from its own capital and facilities. *See* Prunes Aff. [Doc. # 176, Ex. 2]. From the evidence in the record, which plaintiffs do not counter, Otis Brazil was adequately financed, as it has paid its nearly two to three thousand employees from its own funds. *See id.* There is no evidence in the record that suggests any intermingling of accounts between Otis and Otis Brazil.

Plaintiffs do set forth facts suggesting extensive links between Otis and Otis Brazil, including (1) Trademark License, Patent, and Technology Agreements between the two companies, see [Doc. # 180, Ex. 18]; (2) the fact that Otis Brazil was appointed a "Supervising Company" of Otis' export market in Latin America, with significant responsibilities over pricing and other policies, *see* McMahon Memo [Doc. # 190, Ex. 7] at 5208, 5211; and (3) the fact that Otis conducted regular field quality audits of Otis Brazil's facilities, *see* [Doc. # 180, Ex. 17]. None of this is sufficient, however, to demonstrate that Otis Brazil is the agent of Otis. *See infra* discussion of agency relationships. These links also fail to give Otis a role in the production, distribution, or marketing of the elevator in question.

**5.** The CPLA was meant to preempt all common law products liability claims involving "product sellers". *See* Conn. Gen.Stat. § 52–572n(a)(2001). Therefore, it is appropriate to consider plaintiff's common law apparent manufacturer claim only to the extent that the CPLA does not apply. *See Burkert*, 216 Conn. at 73, 579 A.2d 26 ("Since the statute provides only that it is the exclusive remedy for 'claims against product sellers' ..., we conclude that the statute does not foreclose common law claims against those who are not product sellers ....") (citation omitted).

essential nature of the claims against them, notwithstanding the fact that plaintiffs have now articulated a more nuanced legal theory in their brief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("[A]ll the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests …."); *Chahal v. Paine Webber Inc.,* 725 F.2d 20, 23–24 (2d Cir.1984). *See also Gomes v. Avco Corp.,* 964 F.2d 1330, 1334–35 (2d Cir.1992) (allowing Title VII case to be pursued in federal court despite fact that plaintiff failed to properly identify theory of discrimination in EEOC complaint). Because the claim was sufficiently pleaded, it is appropriate to reach the merits.

■ On its merits, plaintiffs' apparent manufacturer claim fails, for the common law apparent manufacturer doctrine, like the CPLA, applies only to product sellers. Connecticut has adopted the Restatement understanding of the apparent manufacturer doctrine, that " '[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer,' " *Burkert,* 216 Conn. at 77–78, 579 A.2d 26 (1990) (quoting 2 Restatement (Second), Torts § 400 (1965)) [6]. As *Burkert* made clear, "the threshold requirement of § 400" is that "the nonmanufacturer can be held liable only if it indeed '[put] out a chattel.' " *Id.* at 78, 579 A.2d 26 (noting further that comment (a) to § 400 "defines

'one who puts out a chattel' as 'anyone who supplies it to others for their own use or for the use of third persons, either by sale or lease or by gift or loan.' "). The Connecticut Supreme Court thus refused to extend the apparent manufacturer doctrine to a trademark licensor "not involved in the production, marketing, or distribution of the defective product." *Id.* at 79, 579 A.2d 26.

Plaintiffs attempt to distinguish *Burkert* on the ground that the Connecticut Supreme Court considered GM's role as the licensor in that case "unusually limited," *Burkert,* 216 Conn. at 68, 579 A.2d 26, while Otis here maintained much more extensive ties to its licensees. But *Burkert* 's holding rested upon the absence of evidence that GM manufactured, distributed, or marketed the product, not on the degree of GM's control over its trademark. *See id.* at 82, 579 A.2d 26 (holding that "the absence of any involvement on the part of GM in the production, marketing or distribution of the defective transmission fluid in this case precludes, as a matter of law, a finding that GM was an apparent manufacturer"). Further, as the *Burkert* Court noted in distinguishing other cases, Connecticut and other jurisdictions have generally relied not simply on the trademark licensor's degree of control over the license, but also on the trademark licensor's involvement in the actual distribution, marketing, or manufacture of the product.[7] For example, in *Burkhardt v.*

---

**6.** Restatement (Third) Torts: Prod. Liab. § 14 (1998), which provides the latest interpretation of the apparent manufacture doctrine, derives from § 400 of the Restatement (Second), and does not change the apparent manufacturer doctrine's application only to sellers of products. Indeed, comment d to section 14 of the Third Restatement has explicitly incorporated the rule adopted by the Connecticut Supreme Court in its discussion of Second Restatement § 400. As comment d

states, "[t]rademark licensors are liable for harm caused by defective products distributed under the licensor's trademark or logo when they participate substantially in the design, manufacture, or distribution of the licensee's products."

**7.** *Burkert* 's survey of the state of the law on apparent manufacture identified only two cases, from other jurisdictions, which imposed liability on a trademark licensor despite

*Armour & Co.*, 115 Conn. 249, 264–65, 161 A. 385 (1932), the licensor actually prepared, packed, and distributed the canned corn beef product that caused injury to the plaintiff. Similarly, in *Hartford v. Associated Construction Co.*, 34 Conn.Supp. 204, 205, 384 A.2d 390 (1978), the trademark licensor had sold to the licensee one of the component materials necessary for the manufacture of the trademarked roofing insulation mixture. Unlike these cases, here there is no evidence that Otis' activities with Otis Brazil or OTESA involved it in any way in the sale, manufacture, or marketing of the elevator in question. As a result, plaintiffs' apparent manufacture claim must fail.

### C. Claims of Negligence and Recklessness on a Principal/Agent Basis

In support of its motion for summary judgment as to Counts 7–12, all of which rely on a theory of vicarious liability, defendants argue that, as a matter of law, there is no agency relationship between Otis and International and OTESA. Plaintiffs point to a number of facts they claim support its position that International and OTESA were agents of Otis.

■ "Agency is the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second), 1 Agency § 1. Thus, three elements are necessary to prove the existence of an agency relationship: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Beckenstein v. Potter and Carrier, Inc.*, 191 Conn. 120, 132–33, 464 A.2d 6 (1983) (citations and internal quotation marks omitted). In this case, plaintiffs have presented considerable evidence as to the third element.[8] Plaintiffs,

---

a lack of evidence of involvement in the actual marketing, distribution, or manufacture of the product. *See Burkert,* 216 Conn. at 80, 579 A.2d 26 (citing *Carter v. Joseph Bancroft & Sons Co.,* 360 F.Supp. 1103, 1107 (E.D.Pa. 1973); *Connelly v. Uniroyal, Inc.,* 75 Ill.2d 393, 410–11, 27 Ill.Dec. 343, 389 N.E.2d 155 (1979)). The overwhelming weight of case authority, however, supports a finding of apparent manufacture only when there is evidence of involvement in the stream of commerce, that is, when there is involvement in the actual marketing, distribution, or manufacture of the product. *See Burkert,* 216 Conn. at 82, 579 A.2d 26.

**8.** For example, Article IV of the Supply Agreement requires International and OTESA to adhere to certain quality standards and procedures, and, as Article IV provides, "[i]n the event that the work done by the Customer under any contract does not meet the standards of Otis, the Customer shall, upon the demand of Otis but at the expense of the Customer, make such changes in such work as may be required by Otis. In the event that the Customer shall fail to do any such work required by Otis to the satisfaction of Otis, Otis may do such work itself or have it done by others and the Customer shall pay to Otis any expense that it may incur in connection therewith..." [Doc. # 180, Ex. 21] at 4635. Otis also retained the right to terminate the contract if International failed to comply with any of its provisions. *See* Supply Agreement, Art. XVII [Doc. # 180, Ex. 21] at 4640. The Supply Agreement further gave Otis the right to enforce its quality standard through regular audits, *see* Supply Agreement, Art. IX [Doc. # 180, Ex. 21] at 4637, and Otis in fact carried out these field audits in the years before and after Mr. Iragorri's death. Moreover, the Supply Agreement prohibited International and OTESA from purchasing elevator components from any company other than Otis. *See* Supply Agreement, Art. I [Doc. # 180, Ex. 21] at 4634.

The License Agreements limits International's and OTESA's use, as licensees, of the Otis trademarks and gives Otis the right to inspect for quality. *See* License Agreements [Doc. # 180, Ex. 22].

however, have presented only very limited evidence that Otis provided for International or OTESA to act *on Otis' behalf,* or that International or OTESA agreed to act on behalf of Otis. Thus, plaintiffs have not met their burden as to the first and second requirements for the establishment of an agency relationship. Because there is insufficient evidence to support essential elements of plaintiffs' claim, summary judgment in favor of defendants is granted as to Counts 7–12, all of which rely on an agent/principal theory of liability.

 "An essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal." *Beckenstein,* 191 Conn. at 133, 464 A.2d 6 (citations and internal quotation marks omitted). If a party acts primarily on his or her own behalf or for his own benefit, therefore, the requisite fiduciary relationship has not been established. *See Macomber v. Travelers Property and Casualty Corp.,* 261 Conn. 620, 639 n. 12, 804 A.2d 180 (2002) ("[O]ne cannot overlook the salient fact that the defendants were also acting primarily for their own benefit and that of their insureds . . . . It therefore follows that the defendants did not owe the plaintiffs the single duty of loyalty characteristic of the relationship that exists between a principal and his agent."). In the absence of an agreement to act on behalf of a principal, an agency does not exist, regardless of the degree of control one party exercises over another.[9] *See* Restatement (Second) Agency, § 1, comment a ("The principal must in some manner indicate that the *agent is to act for him,* and the agent must act or agree to act on the principal's behalf *and* subject to his control.") (emphasis added).

 Plaintiffs point to several facts in support of their contention that there was an agreement between the parties for International and OTESA to act on Otis' behalf. First, they note that OTESA and International were licensees who sold, installed, serviced, and maintained Otis equipment in Colombia, and that the relationship between Otis and the Colombian

---

Whether these ties are sufficient to constitute the kind of control over "day-to-day work" necessary for the establishment of an agency relationship, *see Beckenstein v. Potter and Carrier, Inc.,* 191 Conn. 120, 134–35, 464 A.2d 6 (1983) (holding that a conditional agreement that did not require compliance—unlike the *agreements* between Otis and the Colombian companies—did not establish sufficient control to create an agency relationship); *McLaughlin v. Chicken Delight,* 164 Conn. 317, 324, 321 A.2d 456 (1973) (finding that "plaintiff has totally failed to point to any portion of the contract or to any other evidence in the case which would sustain his burden of establishing that Carfiro was an agent of Chicken Delight," despite extensive series of quality controls Chicken Delight exercised over franchisee), need not be decided, because the agency claims fail in the absence of an agreement for the Colombian companies to act on behalf of Otis, *infra.*

9. Plaintiffs cite a series of cases to support its argument that the degree of control is a sufficient test for agency. *See, e.g. Toledo v. Van Waters & Rogers, Inc.,* 92 F.Supp.2d 44 (D.R.I.2000); *Gulf Refining Co. v. Brown,* 93 F.2d 870 (4th Cir.1938); *Legassie v. Bangor Pub. Co.,* 741 A.2d 442 (Me.1999). But these cases use the degree of control as a means of distinguishing an independent contractor from an employee or "servant", in recognition of the rule that principals generally are not responsible for the physical acts of their independent contractors. *See* Restatement (Second) of Agency § 1 cmt. e. Plaintiffs also claim that International and OTESA were "independent contractors" performing acts for an employer who owed a non-delegable duty to exercise reasonable care for the safety of others. *See* Pl.'s Mem. L. Opp. Summ. J. [Doc. # 180] at 21 (citing Restatement (Second) of Torts § 414). But an independent contractor who acts for the benefit of an employer is an agent, and there can be no finding of agency without an agreement that one party is to act for the other's benefit.

entities was governed by a number of different agreements. *See, e.g.* Supply Agreements [Doc. # 180, Exs. 21 and 25]; Technical Assistance Agreements [Doc. # 180, Exs. 9 and 23]; License Agreement [Doc. # 180, Ex. 22]; Purchase and Sale Agreement [Doc. # 180, Ex. 26]; McMahon Memo [Doc. # 180, Ex. 7]. These agreements contain a number of provisions establishing that Otis maintained significant control over the operations at International and OTESA, *see* supra n. 8, but they do not establish that either International or OTESA acted *on behalf of* Otis. In contrast, defendants point to a variety of provisions in the contracts between Otis and the Colombian entities that clearly indicate the parties' intention that the International or OTESA would act on their own account, not for Otis. *See, e.g.* Supply Agreement, Art. IV ("The contracts between the customer and the end user for Otis equipment to be erected or maintained within Colombia shall be solely for the account and risk of the Customer and any profits derived therefrom shall belong to the Customer.") [Doc. # 177, Ex. 15] at 4635; Supply Agreement, Article XXIV ("The Customer shall not be the representative of Otis or any of its parent, affiliates or subsidiaries and shall have no power to act on behalf of Otis or any of its parent affiliates or subsidiaries, and the Customer agrees not to represent to any third party that it is such a representative or has such power.") [Doc. # 177, Ex. 15] at 4643. Moreover, as defendants argue, citing the Restatement (Second) of Agency, § 14J (1958), a party that buys goods for resale to a third person is not considered the agent in the transaction unless "the parties agree that his duty is to act primarily for the benefit of the ones delivering the goods for him."

Second, plaintiffs place great significance on the representation Otis made to the Colombian Royalty Committee, the government body that approved the terms of Otis' agreements with International and OTESA, that the contractual relationship between Otis and the licensees was "a necessary guarantee for the high level of service that must be provided in order to conserve and upgrade the significant fleet of equipment Otis currently operates in the Republic of Colombia." *See Royalty Committee Application,* [Doc. # 180, Ex. 28] at 4094–95. It appears as though plaintiffs seek to interpret the reference to the "equipment Otis currently operates in the Republic of Colombia," as an admission by Otis that it retained control over this equipment even after the restructuring of the companies. But in itself, this admission is not evidence that International and OTESA operated for anything other than their own benefit.

Third, plaintiffs provide evidence that Otis elevators were advertised in conjunction with International in the phone directory of Cali, Columbia in the years 1989–1992 (the words "Acensores Otis," which translate as "Otis Elevators," were listed above the words "International Elevator, Inc."). To the extent this advertisement might lead readers to believe that International was the same company as Otis, not simply that it sold or repaired Otis elevators, it is misleading. But the phone book advertisement, by itself, is insufficient to manifest an intention to act for the benefit of Otis. Moreover, this evidence is not sufficient to make out a claim of apparent agency, because there is no indication that Mr. Iragorri relied on the fact the elevator was an Otis elevator. *See Hallas v. Boehmke and Dobosz,* 239 Conn. 658, 674, 686 A.2d 491 (1997) ("Apparent authority must be derived not from the acts of the agent but from the acts of his principal. [T]he acts of the principal must be such that (1) the principal held the agent out as possessing sufficient authority to embrace

the act in question, or knowingly permitted him to act in having such authority, and (2) in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed, under all of the circumstances, that the agent had the necessary authority.") (citations and internal quotation marks omitted).

Fourth, plaintiffs note that Otis employees routinely referred to the Colombian entities as Otis "agents." *See, e.g.* Bailey Dep. [Doc. # 180, Ex. 11] at 34–35; Abraham Dep. [Doc. # 180, Ex. 12] at 11; 1993 OFAG Audit of Colombia [Doc. # 180, Ex. 5] at 5262; McMahon Memo [Doc. # 180, Ex. 7] at 5207; 1992 Draft Revisions of Latin American Policies and Procedures [Doc. # 180, Ex. 30] at 5195. Defendants, for their part, argue that "it was always the intent and understanding of the parties that the relationship between Otis and International was a supplier-customer relationship, not a principal-agent or commercial agency relationship." *See* Def.'s Mem Supp. Summ. J. [Doc. # 170] at 10 n. 8; Figueroa–Sierra Aff. [Doc. # 177, Ex. 17], at ¶ 7. Under Connecticut law, however, neither the use of the term "agent," nor the disclaimer of an "agency" relationship, is dispositive. "[T]he labels used by the parties in refer-

ring to their relationship are not determinative; rather, a court must look to the 'operative terms' of their agreement or understanding." *Beckenstein v. Potter and Carrier, Inc.,* 191 Conn. 120, 133–34, 464 A.2d 6 (1983) (citations omitted); Restatement (Second) of Agency; § 1, comment b ("The relation which the law calls agency does not depend upon the intent of the parties to create it, nor their belief that they have done so.").

Finally, plaintiffs point to the fact that Jean H. Mordo, then president of Otis's Latin American Operations, was appointed by International in March 1990 as its "true and lawful attorney-in-fact and agent of the Company" for the duration of his tenure as an officer of Otis. *See* Power of Attorney From International Elevator, Inc. To Jean Mordo [Doc. # 180, Ex. 10] at 4607. But Mr. Mordo's authority as an agent of International was limited to acting for International in matters arising *outside* of Columbia. *See id.* In addition, Mr. Mordo was designated International's agent, not its principal. That Otis may be deemed the agent of International for some purposes cannot turn International into the agent of Otis.[10]

There is also evidence in the record that International and OTESA agreed to pro-

**10.** Plaintiffs also state that Otis "defined, for International, what International's 'product range' would be." See Pl. Br. at 4. In support, they site an internal memo from Brian McMahon, who headed Otis' Latin American division, that states: "LAOHQ will define the product range for each export market after mutual analyses of market conditions." *See* McMahon memo [Doc. # 180, Ex. 7] at 5212. But this does not go to the issue of agency, as it merely states that Otis can decide which of its products it will export. Likewise, plaintiffs state that "Otis also mandated the prices International charged its own customers for maintenance and service," and cite generally to the "Supply Agreement." The Court is unable to find such a term in the Supply Agreement. Article IV of the Supply Agree-

ment, however, states: "The Customer will determine the selling price it will quote to its customers. (Otis may, however, publish suggested prices and may urge conformance with sound business practices toward mutually beneficial attainment of long-range stability and profitability.) In establishing these prices the Customer will include as a profit to it only such percentages and amounts as are reasonable and will not jeopardize the sale of Otis equipment or the reputation of Otis not restrict the natural expansion of the sale of Otis equipment in the Territory ...." *See* Supply Agreement [Doc. # 180, Ex. 21] at Art. IV. While this provision requires International to set "reasonable" prices, it falls short of a "mandate" on prices, and does not give Otis veto power over pricing.

vide Otis with a four percent royalty on their net sales in exchange for Otis' provision of technical assistance. *See* Technical Assistance Agreement Between Otis and International [Doc. # 180, Ex. 9] at 4913, 4927; Technical Assistance Agreement between Otis and OTESA [Doc. # 180, Ex. 23] at 5024, 5035; *see also* Licensing Agreements, ¶ 3 [Doc. # 177, Exs. 18, 19] (incorporating terms of Technical Assistance Agreement). A profit-sharing arrangement of this type is not sufficient for a finding that International and OTESA acted for the benefit of Otis, not simply for their own benefit. As the defendant notes, this type of royalty agreement is commonly used in licensing agreements because it is easy to enforce, and it does not transform sales by OTESA or International into sales by Otis. The net sales royalty is better deemed a mere "derivative benefit," rather than an "essential element of an agency relationship." *Beckenstein v. Potter & Carrier, Inc.*, 191 Conn. 120, 139–40, 464 A.2d 6 (1983) (citing *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 219 S.E.2d 874 (1975)). In a related context, most courts, for example, "have refused to recognize the existence of fiduciary obligations between a franchisor and franchisee in an ordinary franchise relationship," *Existence of fiduciary duty between franchisor and franchisee*, 1998 WL 1809, 52 A.L.R.5th 613 (1998), in which each company independently retains the "right to profit" and the "risk of loss." *Murphy*, 216 Va. at 495, 219 S.E.2d 874. Likewise, here International and OTESA had the ability to make their own contracts with end users for the resale of Otis equipment, which were "solely for the account and risk of the Customer and any profits derived therefrom" belonged to International or OTESA. *See* Supply Agreement, Art. IV [Doc. # 177, Ex. 15] at 4635. Therefore, International and OTESA maintained the requisite degree of independence from Otis to satisfy the conclusion that they did not act on Otis' behalf.

Because International and OTESA were not agents of Otis, Otis cannot be held liable as a principal.

### D. Direct Negligence Claim

Defendants make several arguments in support of summary judgment on Plaintiffs' direct negligence claims in Counts 4–6. First, they assert that plaintiffs direct negligence claims are barred by the statute of limitations, because they were first raised more than nine years after the accident that killed Mr. Iragorri. Second, defendants argue that they owed no duty of care to Mr. Iragorri. Finally, they claim that they did not breach any such duty, and that any breach was not the proximate cause of Mr. Iragorri's death.

### i. Statute of Limitations

Plaintiff's Amended Complaint, which for the first time expressly raised direct negligence claims against Otis, was filed on February 26, 2002, over nine years after Mr. Iragorri's death on October 3, 1992. Thus, unless these new claims are found to "relate back" to the original complaint, the direct negligence claims are barred by the statute of limitations. Under Fed.R.Civ.P. 15(c)(2), "[a]n amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." As the Second Circuit has recognized, "[t]he pertinent inquiry ... is whether the original complaint gave the defendant fair notice of the newly alleged claims." *Wilson v. Fairchild Republic Co.*, 143 F.3d 733, 738 (2d Cir.1998); *see also Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 36 (2d Cir.2002) ("Even if the description of an

act of fraud was not fully developed or specifically described as part of a RICO conspiracy, it would put the defendants on notice that the conduct was at issue."); *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 23 (2d Cir.1994) (finding that for relation back doctrine to apply, "there must be a sufficient commonality" of alleged acts of wrongdoing to preclude a claim of "unfair surprise").

Defendants argue that the direct negligence claims in the Amended Complaint do not relate back because they are based on different material facts. In particular, they note that OTESA and Otis Brazil are mentioned for the first time in the amended complaint, and that the original complaint did not claim that Otis was the employer of International or OTESA, or that Otis knew about the poor performance and training record of the Colombian companies. Plaintiffs, however, refer to paragraph 23 of the original complaint, which states that "Mr. Iragorri would not have been killed but for the negligence on the part of one or more of the Defendants, United Technologies, Otis Elevator and International Elevator. These defendants had control of the dangerous condition which led to Mr. Iragorri's death." *See* Complaint [Doc. # 1] at ¶ 23. Counts 4 through 6 of the original complaint, furthermore, sound in negligence, and specifically incorporate paragraph 23.

Plaintiffs' original complaint was sufficient to have put Otis on notice that plaintiffs intended to hold Otis liable for the death of Mr. Iragorri, and that Otis' alleged negligence formed the basis for the liability. While the amended complaint identified in greater detail the elements of Otis' alleged duty of care, its breach of that duty, and how this contributed to Mr. Iragorri's death, the new claims arose out of the same "conduct, transaction, or occurrence" as identified in the original complaint. The failure to mention Otis Brazil or OTESA in the original complaint is not dispositive; Otis Brazil is not alleged to be a wrongdoer in plaintiffs' direct negligence claim against Otis, and OTESA is not necessary to the direct negligence claim.[11] Moreover, to the extent that plaintiffs originally alleged that Otis "had control over the dangerous condition" that led to Mr. Iragorri's death, defendant was put on notice that its relationship with those entities more directly involved in the manufacture, installation, and repair of the elevator in question were a key factor in the suit. Thus, the amended complaint relates back to the original complaint, and it is appropriate to decide the merits.

### ii. Otis' duty to supervise or assist the Columbian companies.

Plaintiffs identify several grounds in support of their claim that Otis owed them a duty of care. First, plaintiffs argue that Otis owed them a duty because the harm that resulted from Otis' decision to do business with International, and from Otis' failure to provide technical assistance on

---

11. Plaintiffs' claim is that Otis had a duty to provide training in the safe repair and maintenance of elevators to both International and OTESA. The sources of these duties (primarily the contracts and certain voluntary actions undertaken by Otis) are identical as to both OTESA and International. It is International's repairperson, however, not OTESA's, that is alleged to have left the elevator door open, leading to Mr. Iragorri's death. Thus, though plaintiffs include OTESA in the direct negligence claim, it is the alleged breach of Otis' duty toward International that plaintiffs claim led to Mr. Iragorri's death.

Moreover, plaintiffs' new claims that Otis was the employer of International and OTESA should not affect the "relation back" analysis, because they can be independently dismissed for having no basis in the record. *See supra* discussion of agency. Therefore, they should play no role in the direct negligence inquiry.

matters of safety, was reasonably foreseeable. Plaintiffs also argue that holding Otis accountable is appropriate as a matter of public policy. Second, plaintiffs claim that Otis had a duty of care because it retained control over the manner in which International, an alleged independent contractor, performed its work. Third, plaintiffs argue that because Otis voluntarily assumed the duty of providing technical assistance to International, including through a contractual undertaking, that Otis had a duty to provide this assistance in a non-negligent manner. Fourth, plaintiffs argue that Otis is vicariously liable. The second and fourth arguments lack merit, because International and OTESA were not agents of Otis for the reasons described in Part II.C. Plaintiffs' first and third arguments, however, require more discussion. As discussed below, the Court concludes that the existence and scope of Otis' duty of care can be defined by the terms of its Technical Assistance Agreement with International.

Plaintiffs first argue that a duty of care exists if the harm was reasonably foreseeable and imposing liability is appropriate as a matter of public policy. *See, e.g. Gazo v. City of Stamford*, 255 Conn. 245, 250, 765 A.2d 505 (2001) ("We have stated that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.") (citations and

internal quotation marks omitted). They have marshaled a variety of facts to support their claim of foreseeability. For example, they point to the fact that Otis knew International had a poor safety record, but disregarded this because Otis considered Colombia "a third world country," so that "what we assume is an unsafe practice here, might be a standard operation in a Latin country." Bailey Dep. [Doc. # 180, Ex. 11] at 198–99. Otis also gave International failing grades in a number of categories during its field quality audits in 1986, 1989 and 1991, though the overall performance rating was satisfactory in 1991. *See* Otis Field Quality Audits [Doc. # 180, Exs. 3, 4, 5].[12] Though Otis did not specifically audit for safety standards until after Mr. Iragorri's death, in 1993, plaintiffs argue that the audit failures should have put Otis on notice of International's generalized neglect of proper repair procedures. As part of Otis' 1989 audit, for example, it learned that International did not have written policies in a variety of areas that Otis deemed important. *See* Abraham Dep. [Doc. # 180, Ex. 12] at 114–16. In addition, Jay Bailey, an Otis marketing manager responsible for Latin America, testified in his deposition that he knew that International had a "very high callback record" for maintenance services, and International's employees "were not adequately skilled," that he talked with the head of International about these issues, and that he believed there "was room for improvement" in training at International. *See* Bailey Dep. [Doc. # 180, Ex. 11] at 84, 86–87.

These facts may be sufficient for a reasonable jury to conclude that Otis' fail-

---

**12.** The 1989 audit, for example, concluded that "Colombia showed a down trend in the quality of maintenance from 71.1 in 1986 to 66.3 in 1989 for a downtrend of 4.8 points. . . . More effort should be given to field education, job site training and demonstration on how to perform the routines of maintenance." [Doc. # 180, Ex. 3] at 5228.

ure to provide adequate oversight and assistance in the areas of safety and maintenance should have led them to anticipate a harm such as Mr. Iragorri's death. Foreseeability alone, however, is necessary but not sufficient to a finding of duty. *See, e.g. Waters v. Autuori,* 236 Conn. 820, 826, 676 A.2d 357 (1996) ("We disagree with plaintiff's assumption that foreseeability is the fulcrum of duty."); *Gomes v. Commercial Union Insurance Co.,* 258 Conn. 603, 615, 783 A.2d 462 (2001) (" 'A simple conclusion that the harm to the plaintiff was foreseeable, however, cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed.' ") (quoting *Lombard v. Edward J. Peters, Jr., P.C.,* 252 Conn. 623, 632–33, 749 A.2d 630 (2000)). Particularly in the context of an omission, as is the case here, mere foreseeability has never been enough. Absent a legal duty to act, mere foreseeability would subsume too many actors whose failure to act is too attenuated from the resulting harm. Thus, in *Gomes,* a hotel desk clerk was found to be under no duty to act, even though the clerk prevented a hotel guest from rendering aid to stop fire damage to a gas station, because "the attenuation between the hotel defendants' conduct and the plaintiff's harm is too remote, as a matter of public policy, to impose a duty." *Gomes,* 258 Conn. at 617, 783 A.2d 462.

Plaintiffs' arguments in support of a duty, however, do not rest exclusively on a foreseeability test. They also contend that Otis was under a legal duty to provide technical assistance in the areas of safe

maintenance and repair, by virtue of their Technical Assistance Agreements with International and OTESA.

■■■ It is well established that a duty of care may arise from a contract. *See, e.g. Coburn v. Lenox Homes, Inc.,* 186 Conn. 370, 375, 441 A.2d 620 (1982) ("A duty to use care may arise from a contract, [or] from a statute . . . ."). The Restatement, moreover, provides that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or . . . (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second), of Torts, § 324A (1965).[13] While Connecticut has adopted other parts of Restatement section 324A, it has not yet taken a position on Restatement sections 324A(a) and (c). *See Gazo v. City of Stamford,* 255 Conn. 245, 252–253, 765 A.2d 505 (2001) (adopting Restatement § 324A(b)); *Waters v. Autuori,* 236 Conn. 820, 833, 676 A.2d 357 (1996) (finding Restatement § 324A inapplicable to that case because "[i]n the absence of a claim of 'physical harm,' § 324A cannot furnish a basis of recovery for the plaintiff's claim . . . ."). This Court, sitting in diversity, anticipates that the Connecticut Supreme Court would adopt the Restatement rule, and thus this Court will follow

---

**13.** Restatement (Second) of Torts, § 324A also extends liability for a person's voluntary assumption of a duty if "(b)he has undertaken to perform a duty owed by the other to the third person." Plaintiffs have not raised subsection (b), and it does not appear to be

applicable to this case, because Otis has not undertaken to perform the elevator maintenance in a safe manner, rather it has agreed to provide technical assistance to aid International in its performance.

it.[14]

### (1) Existence and Scope of the Contract

Here, there is no dispute that Otis was contractually bound to provide assistance to International and OTESA on the repair and maintenance of elevators.[15] *See* Technical Assistance Agreements [Doc. # 180, Exs. 9, 23]. Article II of the Technical Assistance Agreement provides:

> Subject to receipt of any necessary government approvals and compliance with applicable regulations, OTIS agrees: A. To provide Technical Data to LICENSEE for the purpose of improving the technical knowledge of LICENSEE. Technical Data will consist of the following ... 2. Procedures and methods of maintaining, repairing and modernizing equipment installed in the Territory to improve the quality of the services rendered by LICENSEE and the efficiency of LICENSEE's service personnel.

[Doc. # 180, Ex. 9] at Art. II.

The Supply Agreement between Otis and International, also established an affirmative obligation for Otis to provide materials for the proper installation and servicing of Otis equipment:

> Otis will arrange to have forwarded to the Customer Otis specifications, layouts, illustrations, wiring diagrams, and other drawings to enable the Customer to properly install and service Otis equipment. In installing and servicing Otis equipment, the Customer will adhere strictly to the rulings, procedures and standards established by Otis.

Supply Agreement, Art. IX [Doc. # 180, Ex. 21] at 4637.

The scope of Otis' duty under these contracts, however, is not so clear, and requires further discussion.[16]

### a. Duty to Provide Technical Assistance About Safety Procedures

■ The Technical Assistance Agreements describe only in very general terms the kind of assistance Otis is expected to provide to International or to OTESA, requiring Otis to provide "[p]rocedures and methods of maintaining, repairing and modernizing equipment installed" in Colombia. By its plain language, this includes information about the steps a repair person should take in servicing an elevator. There are several indications, moreover, that Otis and the Columbian companies meant the provision to include the

---

14. The fact that Connecticut used Restatement § 324A as a framework in *Waters*, has not otherwise expressed any skepticism toward Restatement § 324A, and has specifically adopted subpart (b) of § 324A in *Gazo*, are strong indications that Connecticut would adopt the whole of § 324A given the appropriate case. Defendants agreed at oral argument that it was likely the Connecticut Supreme Court would adopt § 324A.

15. While there was some question, on the basis of the record before the court, as to whether the Technical Assistance Agreement became effective prior to Mr. Iragorri's death, the parties agreed at oral argument that prior to Mr. Iragorri's death, Otis was providing technical assistance to International as provided in the Agreement.

16. The Court agrees with plaintiffs' argument in their supplemental brief that the scope of Otis' duty under Restatement 324A is a question of fact, to the extent interpretation of the contracts depends on an examination of the intent of the parties. *See LaFlamme v. Dallessio*, 261 Conn. 247, 251, 802 A.2d 63 (2002) (stating that while the existence of duty is generally a question of law, in some circumstances, a finding of duty "involves elements of both fact and law."); *see also Pratt v. Liberty Mutual Insurance Co.*, 952 F.2d 667, 671 (2d Cir.1992) (noting that where "the existence and scope of [the] defendant's duty depends on the nature and extent of its undertaking," these generally "are questions of fact for the jury").

procedures for the *safe* repair of elevators. For example, in the application Otis, International, and OTESA made to the Colombian Royalty Committee for approval of the technical assistance agreements, the companies described the "usefulness of the contracts" in terms of, in part, the technology transfer in areas of "safety." *See* Royalty Committee Application [Doc. # 176, Ex. 11] at 4096–97.[17] The Technical Assistance Agreement itself "warrants that all Technical Data furnished by it pursuant to this Agreement will be in accord with its own procedures at the time furnished," [Doc. # 180, Ex. 9] Art. IV, and there is no dispute that Otis maintenance procedures addressed safety. *See, e.g.* Otis Employees' Safety Handbooks [Doc. # 180, Ex. 15] at 6873, 6931, 6963, 7171–7173. Moreover, Jay Bailey, the Marketing Manager for Otis Latin American Operations, testified that job site safety standards "could be included" in the category of technical assistance that Otis provided to International. *See* Bailey Dep. [Doc. # 180, Ex. 11] at 165. Other Otis officials testified in depositions that they remained attuned to safety in providing technical assistance to the Colombian companies, even though they did not begin to specifically audit safety issues until 1993. On the basis of these representations, a reasonable jury may conclude that the parties intended that the Technical Assistance Agreement encompass basic safety information regarding elevator repair, not simply mechanical information.

There remains a question, however, of whether a generalized obligation is sufficient, under Connecticut law, to establish a duty of care. In *Waters v. Autuori,* 236 Conn. 820, 676 A.2d 357 (1996), the Connecticut Supreme Court held that defendant's promulgation of professional accounting standards did not establish a duty of care to an investor who relied on the opinion of a certified public accountant claiming to have followed those standards. In so holding, the Connecticut Supreme Court emphasized the generality of the accounting standards, stating that "the standards promulgated by the AICPA are, on their face, insufficient to establish a duty of care .... In light of the generality at which these standards operate, they cannot establish a basis for the imposition of a duty of care to third parties." *Id.* at 828, 676 A.2d 357.

Walters is distinguishable from the case at hand. In *Waters,* the professional accounting standards were not a contractual undertaking, and included standards that were nearly impossible to measure, like requiring the audit to be performed by persons "with adequate technical training," requiring "independence in mental attitude," and requiring "due professional care ... in the performance of the audit ...." *Id.* at 828 n. 6, 676 A.2d 357. In contrast, here the "procedures and methods" for

---

**17.** Section 2.2 of the Royalty Committee Application is entitled "Usefulness of the contracts for the economic and social development of the country," and states, as translated: The technology transfer addressed in the agreements submitted for the Honorable Committee's consideration bears directly on the importance of the so-called 'vertical transport sector' for the country.... [T]echnologies must be gathered that are highly qualified in terms of efficiency, safety and cost, it being a fact that the cutting edge of technological change in vertical transport is found in countries with higher levels of urban development, such as the United States. Thus, we have witnessed how, since the establishment of companies like OTIS ELEVATOR COMPANY (1929) in the country, there has been a continuous transfer of technical know-how from abroad that is currently resulting in a modernizing dynamism of the services and equipment making up the Colombian vertical transport sector. *See* [Doc. # 176, Ex. 11] at 4096–97.

servicing elevators are identifiable, by looking both to what written procedural materials Otis itself has produced, and what methods it teaches to its own technicians. There is evidence in the record that Otis had comprehensive safety manuals in use for its own employees prior to Mr. Iragorri's accident, and that these manuals include clear guidelines about the use of barricades to protect against hazardous conditions, including open elevator hoistways (including the appropriate type and size of barricade, and how they should be installed). *See* Otis Employees' Safety Handbooks [Doc. # 180, Ex. 15] at 6873, 6931, 6963, 7171–7173. Therefore, on the basis of the company's own materials and manuals, a jury could reasonably conclude that the scope of Otis' duty includes the duty to provide safety information as part of Otis' technical assistance.

### b. Duty to Supervise

██ Plaintiffs argue that Otis' duty was even wider-reaching than the provision of safety information. At oral argument, plaintiffs' attorney emphasized that Otis had a duty not only to provide technical assistance in the area of safety, but also to properly supervise the Colombian companies. Plaintiffs' attorney noted that the License and Supply Agreements between Otis and the Colombian companies gave Otis the right to conduct field audits of International and OTESA, and to terminate its relationship with the Colombian companies if they failed to comply with

Otis standards.[18] *See* Supply Agreement, Arts. IX, XVIII [Doc. # 180, Exs. 21]; License Agreement, ¶ 2 [Doc. # 180, Ex. 22].

Plaintiffs misconstrue the contracts. No obligation to conduct the field audits, or to otherwise supervise the Colombian companies, runs from Otis to International or OTESA. The obligation is just the converse—International and OTESA agreed to "receive visits" from Otis field auditors, and to adhere to Otis standards. *See id.* at Art. IX. If International or OTESA failed to comply, then Otis was given the right to terminate its relationship with the companies, but it was not required to do so. *See id.* at Art. XVIII ("Otis *may* terminate this Agreement . . . .") (emphasis added).

The fact that Otis conducted field audits in Colombia, independent of any contractual obligation, also does not create a duty to supervise safety procedures. In fact, plaintiffs concede that Otis did not conduct safety audits until 1993, after Mr. Iragorri's death. *See* Pls.' Mem. Opp. Summ. J. [Doc. # 180] at 2. The field audits conducted prior to 1993 were primarily focused on the mechanics of maintenance, not on workplace safety procedures. *See* [Doc. # 180, Exs. 3–5]. Therefore, it cannot be concluded, under the terms of Restatement § 324A, that Otis gratuitously undertook to supervise or inspect OTESA's or International's safety procedures.[19]

---

**18.** Article IX of the Supply Agreement states: "The Customer agrees to receive visits from Otis field auditors and to give them access to such records, job sites, equipment and materials as they request in order to verify adherence by the Customer to Otis' rulings, procedures and standards." [Doc. # 180, Ex. 21]. Paragraph 2 of the License Agreement likewise provides that "LICENSEE agrees . . . to permit representatives of the LICENSOR to inspect the facilities of the LICENSEE for quality control inspection of The Product and

The Service during reasonable business hours . . . ." [Doc. # 180, Ex. 22].

Article XVIII of the Supply Agreement states: "Otis may terminate this Agreement immediately if the Customer fails to observe or perform any provision of this Agreement or any order issued hereunder . . . ." [Doc. # 180, Ex. 21] at Art. XVIII.

**19.** The imposition of safety audits beginning in 1993 is a subsequent remedial measure that is not admissible to prove negligence.

The Court thus finds that while a reasonable jury may conclude that the scope of Otis' duty included the provision of materials about safety procedures, or other technical assistance, no reasonable jury could extend the scope of Otis' duty to find a duty to supervise, inspect, or to terminate its business relationship with the Colombian entities if they failed to comply with Otis standards.[20]

### iii. Breach

██ Defendants argue that even if Otis had a duty to provide safety information to International, they are still entitled to summary judgment because they did not breach this duty. Breach and proximate cause are normally questions of fact; only when no reasonable juror could conclude otherwise can a court decide the issue as a matter of law. *See Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 306–308, 692 A.2d 709 (1997). Here, defendants have met their summary judgment burden, for plaintiffs have failed to present sufficient evidence from which a jury could find that Otis breached its duty of care. De-

fendants have offered evidence that Jay Bailey sent to International Otis' worldwide workplace safety standards soon after they were adopted on August 17, 1992. *See* Bailey Dep. [Doc. # 180, Ex. 11] at 162–166. These worldwide safety standards include exactly the kind of information about the use of safety barricades that plaintiffs argue would have prevented Mr. Iragorri's death.[21] *See* [Doc. # 180, Ex. 29] at 6494. While the record does not state exactly when the August 1992 safety standards containing directions on the use of barricades were provided to International, Bailey testified that he provided this information promptly, in installments, *see id.*, and plaintiffs have presented no evidence from which a jury could conclude that these standards were not received by International until after Mr. Iragorri's death. At best, the evidentiary scales are evenly balanced as to whether or not Otis breached its duty of care by not properly providing safe repair and maintenance standards. Because plaintiffs bear the burden at trial of proving breach by a

*See* Fed.R.Evid. 407. While the 1993 safety audit may be used for other purposes, such as to show ownership or control, it cannot create a retroactive duty of care. Moreover, as discussed in Part II.C., even to the extent the safety audits show Otis' control over the Colombian entities, the degree of control alone, without evidence that International or OTESA acted on behalf of Otis, is not enough to hold Otis liable on a principal/agent theory.

20. Under the Restatement § 324A, a final determination of duty would also require an assessment of whether Otis should have recognized that its services were necessary for the protection of a third person; and whether either, under subpart (a), Otis' alleged negligence increased the risk of harm to a member of the public like Mr. Iragorri, or, under subpart (c), International relied on the provision of technical assistance from Otis. In this case, the Court finds that it is unnecessary to decide these elements to resolve this case, because the scope of Otis' duty, limited to the

provision of safety information, also limits the facts that are relevant to a determination of whether Otis breached its duty. Therefore, the Court withholds consideration of the remaining elements of the Restatement rule, assumes that Otis owed a duty of care, and moves directly to a determination of breach and proximate cause.

21. Section 5.4 of the *Worldwide Job Site Safety Standards* provides: "Effective precautions shall be provided to protect an open landing entrance. This may take the form of any of the following: A. A barrier, capable of being fixed at the entrance, and which comprises a guard rail a[sic] least 42 inches (107 centimeters) high with a midrail and toe board, or a solid enclosure ... In an occupied building when the landing need to be protected for longer than one work shift, a barrier must be provided that extends to the full height and width of the entrance." [Doc. # 180, Ex. 29] at 6494.

252

preponderance of the evidence, and have failed to present sufficient evidence in this regard, summary judgment in defendants' favor is appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Plaintiffs have submitted other evidence claimed to show breach, such as Otis' failure to conduct safety audits prior to 1993, or Otis' decision not to terminate its relationship with International, knowing International was underperforming in many areas. These omissions, however, are not relevant given the limited scope of Otis' duty, which at most extended only to the provision of safety materials, not to supervision or safety inspection. As a result, plaintiffs' failure to present any evidence showing that Otis did not send safety information on the use of barricades in its possession and used by its personnel, or that International did not receive this information prior to October 1992, dictates the required disposition of defendants' summary judgment motion.[22]

### III. Conclusion

For the above reasons, defendants' motion for summary judgment [Doc. # 169] is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

---

22. Defendants also raise an argument about causation, pointing to the affidavit of Ernesto Pombo, the general manager of International, who states that International has used a maintenance quality checklist since 1991, that specified the use of a public protection barrier when working on an elevator with the hall door open. *See* Pombo Aff. [Doc. # 177, Ex. 16] at 3–4; *see also* Royalty Committee Application Attachment [Doc. # 176, Ex. 12] at 4222. Because the Court finds for the defendant based on plaintiffs' insufficient evidence regarding Otis' breach of their duty, the Court does not reach the issue of causation.